## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LEMON BAY COVE, LLC,

      Plaintiff,

vs.

                                  Case No.:     1:17-CV-00436-MCW
                                  Judge Mary Ellen Coster Williams

UNITED STATES OF AMERICA,

      Defendant.

_____/

---

## PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

---

DAVID SMOLKER (counsel of record)
Florida Bar No.: 349259
ALLISON C. DOUCETTE
Florida Bar No.: 0085577
SMOLKER, BARTLETT, LOEB,
HINDS AND THOMPSON, P.A.
100 North Tampa Street, Suite 2050
Tampa, Florida 33602
Tel. 813-223-3888
Fax 813-228-6422
*Attorney for Plaintiff, Lemon Bay Cove, LLC*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ iii

**I.   Factual and Legal Contentions and Matters for Trial** ....................................... 1

  **A.   The Property** ........................................................................................................ 1

  **B.   Sale of the Property By the State of Florida with the Vested Special Riparian Rights to Bulkhead and Fill-in the Property** ........................................................ 1

  **C.   History of Sale and Prior County Development Approvals and Efforts to Develop The Property by Mr. LeFave** ........................................................................... 2

  **D.   Status of Property as of Acquisition by IHT and Lemon Bay** ....................... 3

  **E.   Lemon Bay's Efforts to Residentially Develop the Property, Including Obtaining SWFWMD Approval** ................................................................................ 5

  **F.   The Corps' Denial of Lemon Bay's Section 404 Wetland Permit** ................. 5

**II.   Lemon Bay's Inverse Condemnation Claims** ..................................................... 8

  **A.   Lemon Bay's Lucas Taking Claims** .................................................................. 8

    *i.   Lemon Bay's Experts* ...................................................................................... 9

    *ii.   The Defendant's Experts and Legal Framework Challenging Relevancy of Testimony on TDUs* ............................................................................................ 11

  **B.   Lemon Bay's *Penn Central* Taking Claim** ................................................... 13

    *i.   The Character of the Governmental Action* ............................................... 14

    *ii.   IHT's and Lemon Bay's Investment-Backed Expectations in Bulkheading and Filling and Developing the Property are Objectively Both Distinct and Reasonable* ........ 16

    *iii.   The Government's argument that knowledge that federal restrictions could potentially prevent certain development does not render Lemon Bay's expectations unreasonable.* ................................................................................................... 19

    *iv.   The Economic Harm to IHT Imputable to Lemon Bay and to Lemon Bay Itself Is Severe* ......................................................................................................... 21

    *v.   The Government's Argument That That Neither IHT Nor Lemon Bay Have Suffered Significant Economic Harm Because Both Paid Nominal Amounts to Acquire The Property Fails* ......................................................................................... 21

  **C.   The Government's Argument That A Lucas Taking Requires Complete Deprivation of All Value Such That Residual Value Defeats The Claim Is Erroneous** 23

**D.   The Government's Argument That Sale Of The Property Constitutes Economic Use Is Contrary To Court of Claims Caselaw** ........................................................................ 25

**E.   The Government's Recoupment of Investment Based on Distressed, Non-Arm's Length Sales of the Property For Nominal Value Fails** ........................................... 26

**F.   The Government's Argument That Conservation is a Use with Economic Value in Charlotte County and that TDUs Must Be Considered under A Lucas Takings Analysis Lacks Both Legal and Evidentiary Support** ...................................................... 27

**G.   Even if the Potential Value of TDUs Must Be Considered In Determining The "After" Value of the Property, There Is No Competent Evidence That The Potential For Sale of TDUs From The Property Actually Contributes To Its Value** .............................. 30

**H.   The Government Cannot Refute or Diminish Lemon Bay's Rights to Bulkhead and Fill under Florida Law** .............................................................................. 31

*i.   Bulkhead and Fill Rights That Vested Prior To The Effective Date Of The Bulkhead Act Were Not Repealed; Rather They Were Expressly Preserved and Ratified In All Respect* ......................................................................... 31

*ii.   Lemon Bay's Bulkhead and Fill Rights Are Riparian Rights Subject to Takings Clause* ........................................................................................ 33

*iii.   Lemon Bay's Right to Bulkhead and Fill is a Separate and Distinct Right Subject to the Government's Taking* ......................................................... 34

*iv.   The Government's Argument That Lemon Bay Has No Bulkhead and Fill Rights Because They Expired Due To Non-Use Or Lemon Bay Owns No Adjacent Uplands Completely Lacks Merit* .............................................................. 36

**I.   *Under Ciampetti v. US*, The Government Cannot Attempt To Defeat Lemon Bay's *Lucas* Or *Penn Central* Taking Claims By Arguing That Diminution Of Value Already Occurred As A Result Of The County's Wetland Regulations** ...................... 37

**III.   Certificate of Service** ........................................................................... 39

# **TABLE OF AUTHORITIES**

## Cases

*In re McKeever*, 166 B.R. 648 (Bankr. N.D. Ill. 1994) ................................................................ 27

*Agins v. City of Tiburon*, 447 U.S. 255 (1980) .......................................................................... 24

*Alamo Rent-a Car Inc. v. Mancusi*, 632 So. 2d 1352 (Fla. 1994) .............................................. 32

*Appleby v. New York*, 271 U.S. 364, 399 (1926) ........................................................................ 34

*Branch Banking & Trust Co. v. Tomblin*, 163 So. 3d 1229 (Fla. 5th DCA 2015) ........................ 3

*Brickell v. Trammell*, 82 So. 221 (Fla. 1919) ...................................................................... 35, 36

*Broward v. Mabry*, 50 So. 2d 826 (Fla. 1909) ........................................................................... 35

*Caples v. Taliaferro*, 197 So. 861, 862 (Fla. 1940) ................................................................... 35

*Century Group, Inc. v. Premier Fin. Svcs., L.P.*, 724 So. 3d 66 (Fla. 3d DCA 1999) ................ 27

*Ciampetti v. U.S.*, 18 Cl. Ct. 548 (Fed. Cl. 1989) ...................................................................... 38

*Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) ............................... 13, 14

*Delta Prop. Mgmt. v. Profile Investments, Inc.*, 87 So. 3d 765 (Fla. 2012) ............................... 27

*Fla. Rock Indus., Inc. v. United States*, 18 F.3d 1560 (Fed. Cir. 1994) ............................... 14, 24

*Fleemon v. Case*, 342 So. 2d 815 (Fla. 1976) ............................................................................ 32

*Good v. U.S*, 29 Fed. Cl. 81 (Fed. Cl. 1997) ............................................................................... 11

*Good v. United States*, 189 F.3d 1355 (Fed. Cir. 1999*)* .............................................................. 14

*Hassen v. State Farm Mutual Auto Ins. Co.*, 674 So. 2d 106 (Fla. 1996) .................................. 32

*Larson v. Independent Life and Accident Ins. Co.*, 29 So. 2d 448 (Fla. 1947) ........................... 32

*Lingle v. Chevron*, 544 U.S. 528 (2005) .................................................................................... 24

*Lost Tree Village Corp. v. U.S.*, 100 Fed. Cl. 412 (2011) ........................................................... 17

*Lost Tree Village Corp. v. U.S.*, 115 Fed. Cl. 219 (2014) ............................................................. 8

*Lost Tree Village Corp*. v. U.S., 787 F. 3d 1111 (Fed. Cir. 2011) ................................... 25, 26, 27

Loveladies Harbor, Inc. v. United States, 28 F.3d 1171 (Fed. Cir.1994) ................................... 25

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) ........................................... 8, 23

*Mildenberger v. U.S.*, 91 Fed. Cl. 217 (2010) ........................................................................... 36

*Nollan v. California Coastal Commission*, 438 U.S. 825 (1987) ............................................ 9, 28

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001) ..................................................... 20, 21, 24, 29

*Palm Beach Isles Assoc., v. U.S.*, 208 F.3d 1374 (Fed. Cir. 2000) ............................................. 17

*Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978) ......................... 8, 24

*Preseault v. U.S.*, 100 Fed. Cir. 1525 (1996) ............................................................................. 21

*Resource Investments, Inc. v. U.S.*, 85 Fed. Cl. 447 (2009) ........................................................ 15

*Rith Energy, Inc. v. United States*, 247 F.3d 1355 (Fed. Cir. 2001) ............................................. 9

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) .................................................................... 14

*Sartori v. United States*, 67 Fed. Cl. 263 (2005) .......................................................................... 9

*State Dept. of Envir. Regulation v. Oyster Bay Estates, Inc.*, 384 So.2d 891 (Fla. 1st DCA 1980)
.................................................................................................................................. 17, 33

*State Farm Mut. Auto Ins. Co. v. LaForet*, 658 So. 2d 55 (Fla. 1995) ........................................ 33

*Stop the Beach Renourishment, Inc. v. Florida Dept. of Environmental Regulation,* 560 U.S. 702
(2010) .................................................................................................................................. 35

*Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725 (1997) ............................ 12, 24, 28, 30

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002) ............ 8

*Trustees of Internal Improvement Fund v. Claughton*, 86 So. 2d 775 (Fla. 1956).......... 33, 36, 37

*Webb v. Giddens*, 82 So.2d 743 (Fla.1955) .................................................................................. 35

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980) ........................................ 29

*Zabel v. Pinellas County Water & Navigation Authority*, 171 So. 2d 376 (Fla. 1965) ......... passim

## Statutes

Laws of 1957, c. 57-362, § 10 ....................................................................................................... 31
Section 253.12(2), Florida Statutes (1957)................................................................................... 31
Section 253.15, Florida Statutes (1953)................................................................................. 1, 37
Section 309.01, Fla. Stat. (2019)................................................................................................. 17

## Other Authorities

J. David Breemer, *Of Nominal Value: The Impact of Tahoe-Sierra on Lucas and the
Fundamental Right to Use Property*, 33 ELR 10331, 10333 (2003) ........................................ 24

## Regulations

40 C.F.R. § 230.10(a)(3) .............................................................................................................. 6

Plaintiff, Lemon Bay Cove, LLC ("Lemon Bay"), by and through undersigned counsel, hereby files and serves its Memorandum of Contentions of Fact and Law pursuant to Rules of the United States Court of Federal Claims, Appendix A., section VI.14(a) as follows:

## I.    Factual and Legal Contentions and Matters for Trial[1]

### A.  The Property

Lemon Bay owns 5.64 acres of privately-owned submerged lands, mangroves and scattered small isolated uplands (the "Property"). The Property is located on Sandpiper Key along Beach Road within unincorporated Charlotte County, Florida.  The Property abuts and lies partially beneath the tidal waters of Lemon Bay to the west and south and Beach Road to the north. Beach Road is a major arterial causeway connecting the south tip of Manasota Key with Englewood, Florida.

### B.  Sale of the Property By the State of Florida with the Vested Special Riparian Rights to Bulkhead and Fill-in the Property

The Property was originally held as sovereign land by the State of Florida Trustees of the Internal Improvement Trust Fund (the "Trustees").  In 1954, Mr. Earl Farr purchased the property from the Trustees as part of a larger undeveloped parcel. At that time, section 253.15, Florida Statutes (1953), provided in material part:

> In case any island or submerged lands are sold by the Trustees, according to the provisions of §§ 253.12 and 253.13, the purchaser shall have the right to bulkhead and fill in same, as provided by § 309.01, without, however, being required to connect the sale with the shore or with a permanent wharf.

Fla. Stat. § 253.15 (1953).

---

[1] Lemon Bay has substantially adopted the findings of fact included within the Court's Opinion and Order dated March 20, 2020, where appropriate.

These rights constitute vested proprietary rights to convert the sovereignty lands sold by filling them in to convert them into uplands for useful development. These rights are appurtenant to and run with title to the lands sold. *Zabel v. Pinellas County Water & Navigation Authority*, 171 So. 2d 376, 380, 381 (Fla. 1965).

### C. History of Sale and Prior County Development Approvals and Efforts to Develop The Property by Mr. LeFave

In August, 2003, after prior owner Sandpiper Key Associates ("SKA") failed to pay taxes on the Property, Mr. Gerald LeFave purchased the property from Charlotte County at a tax sale. Mr. LeFave sought to develop the property beginning in 2007, and hired a Florida engineering firm specializing in site development preparation and surveying, DMK Associates ("DMK"), and an environmental consulting firm, Ecological Services Associates ("ESA"), to assist in acquiring permit approvals for his proposed development, "The Verandahs at Lemon Bay." This development would have required removing almost all the mangroves on the property, constructing a bulkhead, and filling a portion of the property to build 39 condominiums and a boat ramp. In initial discussions held around 2007, DMK informed Mr. LeFave that the proposed development "would not be easy to permit because of the impacts of the wetlands."

DMK did not, however, indicate that such development would be impossible and, in fact, in November 2007, Mr. LeFave obtained preliminary approval from Charlotte County authorities for his development, subject to certain conditions, including Corps approval. Mr. LeFave then met with a local businessman, Mr. Domink Goertz, to seek investment capital for his development. After reviewing Mr. LeFave's development plan and receiving appraisals of the property that valued the Property at $4,740,000 based on a residential highest and best use, Mr. Goertz advised I.H.T. Corporation (IHT), a Florida real estate company, to invest.

Accordingly, in 2008, IHT loaned $750,000 to Mr. LeFave, secured by a mortgage on the

property. Mr. LeFave ultimately defaulted on the loan, and in June, 2010, the Florida court granted summary judgment to IHT for foreclosure of the Property. The Florida court found that the total amount due and owing to IHT was $875,878.02, and held that "[i]f the total sum with interest and all costs of this action are not forthwith paid, the Clerk of Court shall sell the property at public sale" in accordance with Fla. Stat. § 45.031 (1995). On September 3, 2010, an advertised public foreclosure sale was conducted, and IHT purchased the property for a credit bid of $15,200.[2]

### D.  Status of Property as of Acquisition by IHT and Lemon Bay

In September 2011, Mr. Goertz obtained another feasibility report from DMK regarding development of the property. DMK advised that any development would need to comply with Charlotte County's newest "Comprehensive Plan" which, in part, was designed to avoid or mitigate impacts to local wetlands via wetlands restoration or local wetland mitigation credit banking, if available.

Subsequently, IHT, along with two other entities, TSCK Investment, LLC and Real Investment, LLC (which Mr. Goertz owns), created Lemon Bay, a limited liability company, as a special purpose entity to develop the property. Mr. Goertz is a managing member and an authorized agent of Lemon Bay through Real Investment. IHT transferred the property to Lemon Bay in November 2011, for $10.

At the time of IHT's loan to Gerald LeFave and subsequent acquisition of the Property and transfer to Lemon Bay:

(1)     the Property fronted Beach Road, a major arterial causeway connecting the

---

[2] Under Florida law, the foreclosing mortgagee receives a bidding credit amounting to the principal and interest due under the mortgage and its costs of foreclosing. *See Branch Banking & Trust Co. v. Tomblin*, 163 So. 3d 1229 (Fla. 5th DCA 2015) (noting that credit bidding is a judicially created right to bid at a foreclosure sale the amount due on first mortgage debt).

south tip of Manasota Key with Englewood, Florida.

(2)     the Property carried with it the statutorily vested special riparian right to bulkhead and fill it in to create uplands for useful development purposes;

(3)     the Property was designated "MDR," Medium Density Residential under Charlotte County's Future Land Use Map. The Property is zoned "MMF-7.5", Medium Density Multi-Family. The land use and zoning allow residential, commercial and other types of use, including single and multi-family residential at a density of up to 7.5 units per acre for a total of 42 units;

(4)     much of the adjacent, nearby and surrounding waterfront properties had been previously developed with waterfront single and multi-family residential and commercial uses.

(5)     land uses surrounding the subject property included various commercial and residential uses across the bridge to the south, Beach Road and a platted but unconstructed subdivision to the west, and multi-family residential uses to the north. Adjacent to the subject property's northerly boundary is the Sandpiper Key condominium development (75 units on ±12 acres) constructed on a portion of the Property's parent tract. North of the subject property and on the west side of Beach Road is the Harborview Condominium (±3 acres), the Sandpiper Key Yacht Club, and four single-family residential structures.

(6)     access to the Property was available to and from Beach Road which abuts the Property;

(7)     all urban services including water, sewer, electric were available to the Property and were functioning within the local government's adopted levels of service;

(8)     site plan approval would have been required by Charlotte County; and

(9)     Charlotte County previously preliminarily approved a site plan for 39 condominium units on a 2.68-acre portion of the Property in 2007.

### E. Lemon Bay's Efforts to Residentially Develop the Property, Including Obtaining SWFWMD Approval

Lemon Bay began efforts to develop the property, proposing to fill 1.95 acres of the 5.64-acre property and construct a 12-unit single family townhome development instead of the 39 condominiums, previously proposed by Mr. LeFave and preliminarily approved by Charlotte County (the "Project"). In order to construct the Project, it was necessary to remove the mangroves from and fill-in the 1.95-acre portion of the Property and to construct a retaining wall to contain the fill. Lemon Bay hired DMK in order to guide it through its development approval process.

In February and April 2012, Lemon Bay applied to the Southwest Florida Water Management District ("SWFMD") for the required permit. In December 2012, Lemon Bay received an Environmental Resource Permit from the SWFMD. The ERP: (i) provided for placement of the fill and construction of the retaining wall required for the Project; (ii) constituted the State of Florida's certification of compliance with state water quality standards under section 401 of the Clean Water Act; and (iii) approved, as mitigation for the impacts to the mangroves, the purchase of forested saltwater wetland credits from the federally approved Little Pine Island Mitigation Bank. Issuance of the ERP constituted the State of Florida's determination that Lemon Bay had provided reasonable assurances that the adverse impacts to wetlands and surface waters from the proposed development had been sufficiently reduced and adequately mitigated for, and that state-water quality discharge standards would be met.

### F.  The Corps' Denial of Lemon Bay's Section 404 Wetland Permit

On April 13, 2012, after receiving SWFWMD approval, Lemon Bay filed with the Corps an application for a permit to construct the Project pursuant to section 404 of the Federal Clean

Water Act (the "Application"). In deciding whether to approve or deny a section 404 permit, the Corps applies guidelines set forth in Part 230, Code of Federal Regulations (the "404(b)(1) Guidelines"). The fundamental precept of the 404(b)(1) Guidelines is that fill materials should not be discharged into the aquatic ecosystem unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact.

The Corps issued a public notice regarding the Project. Various environmental organizations, including the Lemon Bay Conservancy, the Environmental Conservancy of Southwest Florida, and the Friends of Cape Haze, Inc., all opposed issuance of the permit. The Sandpiper Key Condominium Association, on behalf of the residents of the adjacent Sandpiper Key Condominium, and 411 separate individuals also objected to issuance of the permit. Further, the federal Environmental Protection Agency ("EPA") and National Marine Fisheries Service expressed concerns regarding the Project's impact on mangrove wetlands, marine habitats, and local fish and wildlife. The EPA in particular designated the mangrove wetlands on the property to be "aquatic resources of national importance (ARNI)"[3]

In accordance with applicable federal regulations, the Corps presumes less environmentally damaging alternative sites for non-"water dependent" proposed developments exist. 40 C.F.R. § 230.10(a)(3). Under federal regulations, a development is "water-dependent" when "the activity associated with a discharge which is proposed for a special aquatic site" requires "access or proximity to[,] or siting within[,] the special aquatic site in question to fulfill its basic purpose." 40 C.F.R. § 230.10(a)(3). The Corps determined that Lemon Bay's proposed

---

[3] The rhetorical force of EPA's ARNI designation is far greater than its actual ecological significance. It stems from a 1992 Memorandum of Agreement between EPA and the Corps which sets out the bureaucratic process and timing for resolving EPA's objections to Corps permitting decisions. There is no definition of an ARNI in the Clean Water Act, EPA or Corp regulations or the memorandum itself.

development was non-water dependent because the Project's "basic project purpose" was "to construct houses, [and did] not require access . . . [to] a special aquatic site."

The Corps cannot issue a Section 404(b) permit for a non-water dependent development unless the applicant "clearly demonstrate[s]" that no alternative sites are available. 40 C.F.R. § 230.10(a)(3). This requirement is known as the "least environmental[ly] damaging practicable alternative" test. Lemon Bay submitted a "Practical Alternatives Narrative" in December 2012, which analyzed three proposed alternative sites in the Charlotte County area. Lemon Bay further represented that, as the property was acquired due to foreclosure, development of this specific land was the only way for the "lender, and now current owner" to avoid "incurring a total loss on this investment."

Thereafter, in February 2013, Lemon Bay amended the Project application to include a 13-slip dock, necessitating a new public notice period. According to the Corps, inclusion of the dock raised new concerns regarding the West Indian manatee under the Endangered Species Act and the Marine Mammal Protection. Accordingly, Lemon Bay responded by reducing the number of slips on the dock from 13 to nine, and another public notice period commenced. The parties' back and forth continued for two-and-a-half years. Ultimately, the Corps contended that Lemon Bay had not adequately demonstrated that no less environmentally-damaging alternative sites existed.

The Corps denied Lemon Bay's permit application with prejudice on February 1, 2016, finding that it did "not comply with Section 404(b)(1) guidelines" and was "contrary to the public interest." Lemon Bay administratively appealed the decision on March 29, 2016; the Corps denied that appeal on December 19, 2016. The United States has not offered to compensate Lemon Bay for the economic impact of its permit denial.

II.     **Lemon Bay's Inverse Condemnation Claims**

Lemon Bay filed this action on March 27, 2017, filing its amended complaint on May 4, 2017. ECF No. 1; ECF No. 5. In its four-count amended complaint, Lemon Bay alleges four takings theories. Counts I and III allege "categorical" takings of Lemon Bay's "vested statutory right to bulkhead and fill the property," and of the Property itself, under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992). Counts II and IV allege "regulatory" takings under the factors set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), of the same "vested statutory right" and of the property. The United States' Amended Answer to Lemon Bay's Amended Complaint denies certain factual allegations but contains no affirmative defenses.

A.  **Lemon Bay's Lucas Taking Claims**

In *Lucas*, the Supreme Court set forth a specific rule for a narrow subset of regulatory takings cases: compensation is required "where [a] regulation denies all economically beneficial or productive use of the land." 505 U.S. at 1015. Commonly referred to as "categorical" takings, such cases are rare--Lucas's holding is limited to the "extraordinary circumstance" where absolutely "no productive or economically beneficial use of land is permitted." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330 (2002) (emphasis omitted*). See, e.g., Lost Tree Village Corp. v. U.S.*, 115 Fed. Cl. 219, 231 (2014), *aff'd*, 787 F.3d 1111 (Fed. Cir. 2015) (determining that when the Corps denied a central Florida property owner a Section 404 permit, the value of the property with a permit would have been $4,245,387.93 but without the permit, only $27,500, and that this 99.4% diminution of value "constitute[d] a categorical taking under Lucas"). Importantly, *Lucas*'s focus is on **developmental** use of the property alleged to have

been taken.[4]

If a court finds that a *Lucas* "categorical" taking has occurred, the takings inquiry ends, and no analysis under *Penn Central* is performed. "Only when a taking is non-categorical does the court embark on the fact-based inquiries dictated by *Penn Central*." *Sartori v. United States*, 67 Fed. Cl. 263, 274 (2005) (citing *Maritrans Inc. v. United States*, 342 F.3d 1344, 1351 (Fed. Cir. 2003)). For that reason, the Federal Circuit has stated that "it is often important to determine at the outset whether a particular claimed taking was 'categorical' or not." *Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1362 (Fed. Cir. 2001) (on rehearing).

### i. *Lemon Bay's Experts*

Lemon Bay contends that the Corp's permit denial denies all economically beneficial or productive use of both the Property and the special riparian right to bulkhead and fill in the Property, and, therefore constitutes a *Lucas* categorical taking. Dr. Henry Fishkind, Lemon Bay's renown real estate economist, with extensive experience in economic analysis of Florida real estate sale and development will testify that, without the ability to fill and bulkhead the Property, there is only a thin, sliver of dry land remaining along Beach Road making residential development of the Property impossible. He will further testify that the Corp's permit denial renders the Property economically worthless and deprives Lemon Bay of the economically viable use of its land and the rights to bulkhead and fill the land.

---

[4]*Lucas* equates economically beneficial use with "habitable or productive **improvements**" to the land. and noted that **building** a home on the land is an "essential use of land." 505 U.S. at 1031 (emphasis supplied); *Id*. at 1025, n. 12 (referring to "all **developmental** or economically beneficial land uses") (emphasis supplied); *also see, Nollan v. California Coastal Commission*, 438 U.S. 825 (1987) (referring to "the **right to build** on one's property" as something inherent to land ownership) (emphasis supplied; *Palazzolo v. Rhode Island*, 533 U.S. 606, 631 (2001) (finding no taking under *Lucas* because the subject property retained $200,00 worth of "**development value**.")(emphasis supplied).

According to Dr. Fishkind, without sufficient land for parking, passive recreation, fishing, dock rental, boat launching and a small marina operation are all impossible. Based on his review of the record and the Corp's permit denial, he concludes that is it is not reasonably likely that the Corps would allow any filling on the Property. He will further testify that, without the possibility of some viable economic use, it is highly unlikely that the State of Florida or any conservation organization would be willing to purchase the Property to preserve it since the Property is already effectively preserved given that it cannot be developed or actively used without filling at least a portion of it.  In addition, he will testify that its small size makes the Property unattractive for such sale.

Linwood Gilbert, Lemon Bay's real estate valuation expert, is of the same opinion, and will testify that in the absence of the ACOE permit, the property would not be developable.  He will testify to having valued the Property with and without a Corps permit as of the December 19, 2016 date of taking, which is when Lemon Bay's administrative appeal of the Corps permit denial was rejected. With a Corp's permit, Mr. Gilbert will testify that the highest and best use of the Property is as a seven unit residential subdivision with a seven slip boat dock. Based on this highest and best use, and using a discounted cash flow analysis, he valued the Property at $3,885,000 as of the date of taking. Mr. Gilbert will further testify that without a Corps permit, the Property is not developable for any economically beneficial use and would have only the nominal value of $12,500. The difference in values equates to a 99.68%. reduction in the value of the Property due to the Corps' permit denial.

Because the special riparian right to bulkhead and fill the Property is the right to create the uplands upon which the residential subdivision was proposed to be built, Mr. Gilbert valued the bulkhead and fill rights using the same analysis valuing the rights at $3,885,000 with a Corps

permit and $12,500 without a Corps permit.  Both Mr. Gilbert and Mr. Fishkind are supported by the expert opinions of David DePew, PhD, who will testify on the development potential of the Property, including the relevant zoning and land use restrictions.

### ii. The Defendant's Experts and Legal Framework Challenging Relevancy of Testimony on TDUs

The government's real estate appraisal expert, William Carlson concedes that without a Corps permit, the Property has no economically beneficial development use and is worth a nominal $25,000 for development purposes. However, he also values the Property at $25,000 with a Corps permit.  This valuation assumes that the Property could not be developed even with a Corps permit.

Mr. Carlson's assumption is based entirely on the opinion of Mr. Ian Vincent, the Government's environmental permitting expert. Mr. Vincent claims that Charlotte County wetland comprehensive plan policies and land development regulations would have precluded bulkheading and filling of the Property because it consists almost entirely of wetlands. This assumption is contrary to this Court's precedent holding that "state and county restrictions...may not validly be asserted to effect a total defense to a *Lucas per se* claim." *Good v. U.S*, 29 Fed. Cl. 81, 105 (Fed. Cl. 1997) (citing *Ciampetti v. U.S.*, 18 Cl. Ct. 548 (Fed. Cl. 1989)). Not only is such an assumption not legally permissible, but even if it were, Mr. Vincent's opinion does not pass muster under *Daubert* as will be detailed in a subsequently filed motion *in limine.*

As noted, Mr. Carlson, as the Government's appraiser, did not value the Property with a permit for development purposes. Rather Mr. Carlson valued the potential for perfecting and selling to third parties forty-two Charlotte County transferable development units ("TDUs") which he opines would have had a present value of $570,000.  However, Mr. Carlson concedes that the sale and transfer of TDUs is not a developmental use of land and that it requires the land to remain in its natural state. As previously noted, *Lucas*'s focus is on **developmental** use of the property

11

alleged to have been taken.  The perfection and transfer of TDU's is not a use of the land itself

and, therefore cannot be put on the taking side of the equation as explained by Justice Scalia's

concurring opinion in *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725 (1997), joined

by Justices O'Connor and Thomas. They concluded:

> TDRs, of course, have nothing to do with the use or development of the land to
> which they are (by regulatory decree) "attached." The right to use and develop one's
> own land is quite distinct from the right to confer upon someone else an increased
> power to use and develop his land. The latter is valuable, to be sure, but it is a new
> right conferred upon the landowner in exchange for the taking, rather than a
> reduction of the taking. In essence, the TDR permits the landowner whose right to
> use and develop his property has been restricted or extinguished to extract money
> from others. Just as a cash payment from the government would not relate to
> whether the regulation "goes too far" (i.e., restricts use of the land so severely as to
> constitute a taking), but rather to whether there has been adequate compensation
> for the taking; and just as a chit or coupon from the government, redeemable by
> and hence marketable to third parties, would relate not to the question of taking but
> to the question of compensation; so also the marketable TDR, a peculiar type of
> chit which enables a third party not to get cash from the government but to use his
> land in ways the government would otherwise not permit, relates not to taking but
> to compensation.

*Id.* at 747; *also see* discussion of TDUs at pp. 27-30 herein.

But even if the availability of TDUs is relevant to a *Lucas* taking, Mr. Carlson's opinion is

of TDU value is inadmissible for various reasons. First, he did not perform his own independent

analysis of the TDU market. Rather, he relies entirely upon, and is acting as a conduit for the wildly

speculative, unsupported and unreliable opinions of Mr. Andrew Dodds, an environmental

consultant turned real estate broker with experience in the Charlotte County TDU market. Mr.

Dodd's opinions will be the subject of a *Daubert* motion to be subsequently filed. Second, even if

Mr. Dodd's opinions are admissible, Mr. Carlson's opinion is limited to the present value of the

future sale of TDUs potentially derivable from the Property. Notably, he did not find that the value

he assigned to the TDUs actually contributed to the value of the Property or the bulkhead and fill

rights themselves.

Thus, not only is Mr. Carlson's opinion of the value of the TDUs irrelevant, but, as it stands, there is no evidence in the record of this case that the potential for sale of TDUs actually contributes value to the land or rights in question. Nor is there any supporting testimony or evidence in the record of this case of actual sales of land whose sales price reflected the contributory value of the potential to perfect, sell and transfer Charlotte County TDUs. Accordingly, the only testimony and evidence in this case of the value of the Property and the bulklhead and fill rights with a permit for development purposes is that of Mr. Gilbert ($3,885,000). Moreover, the only testimony and evidence in this case of the value of the Property and rights without a permit are the opinions of Mr. Gilbert ($12,500) and Mr. Carlson ($25,000). This establishes a diminution in the value of the Property and the bulkhead and fill rights without a permit of 99.36%-99.68%.

In sum, testimony and evidence in this case will establish that the Corps' permit denial constitutes a *Lucas* taking, and that no analysis under Penn Central is necessary.

### B.  Lemon Bay's *Penn Central* Taking Claim

Even if the Court concludes that the Corps' permit denial does not rise to the level of a *Lucas* taking, Lemon Bay contends that consideration of the factors under *Penn Central* establishes a taking of both the Property and the special riparian right to bulkhead and fill it.  "Under *Penn Central*, courts use a three-factor analysis to assess claimed regulatory takings: (1) character of the governmental action, (2) economic impact of the regulation on the claimant, and (3) extent to which the regulation interfered with distinct investment-backed expectations." *Cienega Gardens v. United States*,  331 F.3d 1319, 1337 (Fed.  Cir.  2003); *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120 (9th Cir. 2010) (stating that *Penn Central*'s reference to "distinct" means "capable of being easily perceived, or characterized by individualizing qualities" and "'[d]istinct investment-

backed expectations' implies reasonable probability" of recovery on the investments).

The first factor addresses whether a burden benefiting the public was "placed disproportionately on a few private property owners." *Cienega Gardens*, 331 F.3d at 1338. The second factor, the economic impact of the regulation on the claimant, is "measured by the change, if any, in the fair market value caused by the regulatory imposition." *Fla. Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1567 (Fed. Cir. 1994) (internal citation omitted). "In determining the severity of the economic impact, the owner's opportunity to recoup its investment or better, subject to the regulation" is considered.  Id.

Under the third factor, a plaintiff must demonstrate objectively reasonable investment-backed expectations. *Good v. United States*, 189 F.3d 1355, 1360 (Fed. Cir. 1999*); see Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005-06 (1984) ("A reasonable investment-backed expectation must be more than a unilateral expectation or an abstract need.") (internal quotations omitted). This factor incorporates "an objective, but fact-specific inquiry into what, under all the circumstances, the [plaintiffs] should have anticipated." *Cienega Gardens*, 331 F.3d at 1346.

### i.  *The Character of the Governmental Action*

The effect of the Corps' permit denial is to preclude any development of the Property and to prevent exercise of the special riparian right to bulkhead and fill the Property thereby preserving the Property in its natural state. The starting point for determining whether a burden  benefiting the  public  is being placed "disproportionately on a few private property owners" is the benefit bestowed upon the public by the Clean Water Act and the Corps' section 404(b)(1) Guidelines themselves.  Their purpose "is  to restore and maintain the chemical, physical, and biological integrity of waters of the United States through the control of discharges of dredged or fill material."  The Guidelines reflect a national public policy of prohibiting filling of wetlands unless

14

such filling will not have unacceptable direct or cumulative adverse impacts on aquatic ecosystems of concern. *See* 33 U.S.C § 1344(b); 40 CFR s. 230.1.

As this Court observed in *Resource Investments, Inc. v. U.S.*, "the mere *purpose* of the government action being beneficial or deriving from an intent to help the public does not immunize the government's actions under this prong of *Penn Central*." 85 Fed. Cl. 447, 517 (Fed. Cl. 2009) (emphasis in original). "Instead, the court must consider the nexus between the regulation and it effects looking at the relative benefits and burdens associated with the regulatory activity." *Id*. (internal quotations and citations omitted). The removal of 2.086 acres of Lemon Bay's tidal, forested mangrove wetlands represents removal of just .018 percent of the total mangrove shoreline of Charlotte Harbor. Based on the Corp's Memorandum of Record denying Lemon Bay's Application, the public is benefited by denial of the permit by avoiding:

(1)     the removal of mangroves that would otherwise impact native animal species that depend upon mangroves;

(2)     the reduction of shoreline protection that would otherwise increase turbidity and adversely affect adjacent seagrass beds and marine life;

(3)     the discharge of additional pollution and adverse water quality impacts on the surrounding tidal ecosystem;

(4)     the loss of the wave attenuation benefits of the mangrove shoreline;

(5)     the adverse impacts to the biological characteristics of the aquatic ecosystem, including to Essential Fish Habitat, Threatened and Endangered Species and fish, crustaceans, mollusks and other aquatic organisms, including birds, amphibians, and reptiles and mammals;

(6)     the reduction of mangroves and adverse impacts within the Lemon Bay Aquatic Preserve and the Charlotte Harbor National Estuary Program designed to restore and protect the

adjacent Charlotte Harbor estuary which serves as habitat for fish, Manatees, wood storks, sea turtles and dolphins;

(7)     the increase in prop scaring of sea grass beds from boats;

(8)     the adverse impact to sea grasses from the shading of the proposed 7-slip boat dock;

(9)     the negative impact to recreational and commercial fisheries of national economic importance having and economic impact of $5.4 billion and supporting over 54,000 jobs; and

(10)     increased residential development and reduction of the natural aesthetic appeal of the waters and shoreline of Lemon Bay.

According to the Corps' Memorandum of Record, therefore, the public at large is benefited by the denial of the permit which avoids all of these alleged adverse impacts. However, the burden of these benefits is placed exclusively and disproportionately upon Lemon Bay and other similarly situated owners of property containing regulated mangrove wetlands who must forego the development and use of their properties in order to bestow such benefits on the public. The disproportionate impact is particularly acute in Lemon Bay's case given that: (1) virtually the entire property is mangrove wetlands leaving Lemon Bay with no developable uplands; (2) Lemon Bay's proposed development would impact only .018% of the mangrove shoreline of Charlotte Harbor; (3) the permit denial results in both the $3,885,000 loss of a highest and best use of the Property for a residential development and the complete destruction of its vested special riparian right to bulkhead and fill the Property and thereby to convert it to useful uplands.  This factor weighs in favor of Lemon Bay.

### ii.   IHT's and Lemon Bay's Investment-Backed Expectations in Bulkheading and Filling and Developing the Property are Objectively Both Distinct and Reasonable

As this Court has held, "[t]he regulatory regime in place at the time property is acquired

is relevant to the determination of reasonable investment-backed expectations, but the existence of a regulatory regime does not preclude a reasonable expectation that a permit could be obtained. *See*, *Lost Tree Village Corp. v. U.S.*, 100 Fed. Cl. 412, 437–38 (2011) (citing *Palazzolo v. Rhode Island*, 533 U.S. 606, 633 (2001). On balance, IHT's and Lemon Bay's expectations in the development and use of the Property and in the exercise of the statutory rights to bulkhead and fill the Property are both distinct and reasonable for the reasons that follow:

(1)     the sale of the Property into private hands carries with it the vested statutory right to bulkhead and fill it based on the determination of the highest officials of the state of Florida that it was in the public interest to reclaim these lands. While section 253.15 was repealed by Laws of Florida 1957, c. 57-362 § 10) (1957), the vested character of these rights was statutorily preserved. *Also see* discussion of special riparian right at pp. 30-37. Indeed, section 309.01 prescribing the method of bulkheading and fill is still on the books as testament to the continued viability of these rights. § 309.01, Fla. Stat. (2019). Moreover, Florida case law decided both after the repeal of section 253.15 and before and after the Corp's began regulation of mangrove wetlands in the late 1960s and early 1970s confirms the vested proprietary status of these rights the exercise of which may not be denied without payment of compensation;[5]

---

[5] *Zabel v. Pinellas County Water & Navigation Authority*, 171 So. 2d 376, 380, 381 (Fla. 1965) ( "[T]he statutory rights to dredge, fill and bulkhead the land, subject to reasonable limitations, are [the landowner's] only present rights attributable to ownership of the submerged land itself," and constitute "'property' in the Fourteenth Amendment to the U.S. Constitution [that] includes the right to *acquire, use and dispose* of it for lawful purposes, and the constitution protect each of these essentials.'" (quoting *Kass v. Lewin*, 104 So. 2d 572, 578 (Fla. 1958)) (emphasis original); *State Dept. of Envir. Regulation v. Oyster Bay Estates, Inc.*, 384 So.2d 891, 895 (Fla. 1st DCA 1980) ("[T]he State cannot, after selling submerged land to private owners, then deny to such owners the right to use those lands in the only way in which private ownership can be of any value.") Federal courts confirm Florida courts on this point. *Palm Beach Isles Assoc., v. U.S.*, 208 F.3d 1374, 1381 (Fed. Cir. 2000) (finding that Court of Federal Claims erred in finding no categorical taking where plaintiff had right to dredge and fill property under state law and denial of permit took all economically viable use of the property by hindering that right).

(2)     the County and the Corps previously approved the bulkheading and filling of a much larger, 12-acre portion of the Property's parent tract that also carried with it the same vested bulkhead and fill rights;

(3)     the Property is in a prime location fronting on and having access to a major roadway Manasota Key with Englewood within an area already heavily developed with commercial and residential development and having available to it all necessary public utilities and services;

(4)     the Property is designated "MDR," Medium Density Residential under Charlotte County's Future Land Use Map is the land use constitution under Florida law.  The Property is zoned "MMF-7.5", Medium Density Multi-Family. The land use and zoning allow residential, commercial and other types of use, including single and multi-family residential at a density of up to 7.5 units per acre for a total of 42 units;

(5)     in 2007, Charlotte County preliminarily approved a site plan for a condominium project of 39 or 92.9% of the available units on a 2.68 acres or 47.5%  of the Property's overall 5.64 acres;

(6)     before lending money to Gerald LeFave, Domink Goertz on behalf of IHT reviewed this site plan and an appraisal valuing the Property at $4,470,000 for residential development purposes;

(7)     in 2012, the Southwest Florida Water Management District issued an Environmental Resource Permit approving the filling of a 1.95-acre portion of Property for residential development purposes;

(8)     Lemon Bay's proposed development sought to utilize only 12 or 28.6% of the 42 available units and to bulkhead and fill only 2.09 acres or 37% of the Property's overall 5.64 acres; and

(9)     Lemon Bay's proposed development could be constructed in compliance with applicable state and local regulations including the County's comprehensive plan and land development regulations including with County wetland comprehensive plan policies and land development regulations by avoided filling 63% of the Property, preserving a mangrove shoreline buffer, preserving the submerged portions of the Property and securing mangrove mitigation credits in the Pine Island Mitigation Bank sufficient to offset the impacts of its proposed filling.

### iii.   The Government's argument that knowledge that federal restrictions could potentially prevent certain development does not render Lemon Bay's expectations unreasonable.

The Government argues that Lemon Bay's *Penn Central* claim fails because IHT's and Lemon Bay's expectations in being able to develop the Property are not reasonable because the they had both actual and constructive knowledge that federal restrictions could prevent development. However, such notice does not as a matter of law render Lemon Bay's and IHT's expectations objectively abstract or unreasonable in light of the facts described above. Moreover, the Government's argument completely ignores the essential vested proprietary character of the bulkhead and fill rights that run with the Property.

These rights vested upon the Trustees' sale of the Property's parent tract into private hands in 1954. Such sale constituted the State of Florida's determination that the sale and bulkheading of the property would not be contrary to the public interest. Furthermore, at that time, Corps jurisdiction was limited to navigational concerns. Corps jurisdiction did not extend to wetlands adjacent to navigable waters of the United States.[6]

---

[6] The Corp's jurisdiction over wetlands such as mangroves located adjacent to navigable waters of the United States under the Clean Water Act originated in the Federal Water Pollution Control Act Amendments of 1972, 86 Stat. 816.  After initially construing the Act to cover only waters navigable in fact, in 1975 the Corps issued interim final regulations redefining "the waters of the United States" to include not only actually navigable waters but also tributaries of such waters,

Furthermore, the Government's "notice" argument was squarely rejected by the United States United States Supreme Court in 2001 by the United States Supreme Court in *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001). The United States Supreme Court reversed the Rhode Island Supreme Court's holding that Palazzolo's claims were precluded because he acquired title after the state's enactment of wetland regulations. *Palazzolo*, 533 U.S. at 630. The Court first characterized the Rhode Island Supreme Court's holding as a "sweeping rule: a purchaser or a successive title holder...is deemed to have notice of an earlier-enacted restriction and is barred from claiming that it effects a taking." *Id*. at 626. It then squarely rejected this rule concluding that it would grant unlimited power to the states to unilaterally define which property interests would receive constitutional protection:

> The State may not put so potent a Hobbesian stick into the Lockean bundle... The right to improve property, of course, is subject to the reasonable exercise of state authority, including the enforcement of valid zoning and land-use restrictions...The Takings Clause, however, in certain circumstances allows a landowner to assert that a particular exercise of the State's regulatory power is so unreasonable or onerous as to compel compensation. Just as a prospective enactment, such as a new zoning ordinance, can limit the value of land without effecting a taking because it can be understood as reasonable by all concerned, other enactments are unreasonable and do not become less so through passage of time or title. Were we to accept the State's rule, the postenactment transfer of title would absolve the State of its obligation to defend any action restricting land use, no matter how extreme or unreasonable. A State would be allowed, in effect, to put an expiration date on

---

interstate waters and their tributaries, and nonnavigable intrastate waters whose use or misuse could affect interstate commerce.  40 C.F.R. § 31320 1975, and in 1977 refined the definition of wetlands to mean:

> those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas.

33 CFR § 323.2(c) (1978). Thus it was not until 1977 that the Corps adopted regulations requiring permits to bulkhead and fill mangroves adjacent to navigable-in-fact waters of the United States such as those in this case. *See, U.S. v. Riverside Bayview Homes, Inc*., 474 U.S. 121, 121-26 (1985) for detailed discussion.

the Takings Clause. This ought not to be the rule. Future generations, too, have a right to challenge unreasonable limitations on the use and value of land.

*Id*.

In sum, this factor weighs in favor of Lemon Bay.

### iv.   The Economic Harm to IHT Imputable to Lemon Bay and to Lemon Bay Itself Is Severe

IHT's total investment in the Property was $891,078.02 at the time of sale. IHT's losses are imputable to Lemon Bay by virtue of IHT's and Lemon Bay's status as related entities. *See, e.g. Preseault v. U.S.*, 100 Fed. Cir. 1525, 1540 (1996) ("Under the governing law of the State, the Preseaults, successors in title to those who owned the property when the easements were created, owned the same title and interest, and are entitled to the same protections the law grants."); *Palazzolo v. Rhode Island*, 533 U.S. 606, 613, 626-28 (2001) (reorganization of owner of property and transfer of company did not preclude *Penn Central* taking claim based on no reasonable investment-backed expectation solely because the regulation predated ownership).   Even if not imputable, Lemon Bay has suffered its own serious economic harm when measured by the difference between the value of the Property based on its highest and best use with a Corps permit compared to its value without a Corps permit.   *See, Lost Tree Village Corporation v. U.S.*, 115 Fed. Cl. 219, 233 (2014) ("When considering *Penn Central's* economic impact factor,  a court must 'compare the value that has been taken from the property with the value that remains in the  property.'"). With a Corps permit, the Property is worth $3,885,000 according to Lemon Bay's real estate appraiser, Linwood Gilbert. Without a Corps permit, the Property has a nominal value of $12,500.  This represents a reduction in value of 99.68%.

### v.   The Government's Argument That That Neither IHT Nor Lemon Bay Have Suffered Significant Economic Harm Because Both Paid Nominal Amounts to Acquire The Property Fails

The Government argues that neither IHT nor Lemon Bay have suffered significant

economic harm because IHT only paid $15,200 to acquire the Property at a foreclosure sale and that the Property could be sold for a comparable sum.  This argument completely ignores IHTs loan losses of $891,078.02.  If such losses are taken into account, and the Property could be sold for what the two appraisers say the property is worth for development purposes without a permit (i.e., $12,500-$25,000), IHT will suffer a loss of its investment of 97.19% and 98.60%.

The Government's argument also ignores the requirement that the economic harm properly be measured by comparison of the value of the property with and without a Corps permit based on the property's highest and best use.  As this Court has held, the property alleged to have been taken must be valued "in accord with its fair market value at its 'highest and best use,' meaning with a Section 404 permit or absent the regulatory scheme entirely." *Lost Tree Village v. U.S.,* 115 Fed. Cl. 219, 231 (Fed. Cl. 2014) (*citing Brace v. U.S.,* 72 Fed.Cl. 337, 350 (Fed. Cl. 2006) (citing *Olson v. United States,* 292 U.S. 246, 255 (1934)); *Walcek v. United States* 49 Fed.Cl. 248, 261– 265 (2001) ("[T]he denominator of the economic value fraction must be the value of the entire [p]roperty, unencumbered by wetlands regulations.")).  In this regard, the Government appears to argue that neither IHT nor Lemon Bay has suffered any economic harm because the Property could not have been developed under Charlotte County's wetland comprehensive plan polices and land development regulations before the Corps' permit denial and that both before and after the Corps' permit denial, Lemon Bay could perfect sell and transfer to third parties 42 TDUs.  These arguments are not sustainable either factually or as a matter of law for the reasons previously discussed herein and as will be detailed in motions in limine to be subsequently filed directed to Ian Vincent's Andrew Dodd's and William Carlson's opinions.

In short, Mr. Vincent's opinion that Lemon Bay's proposed residential subdivision would not be approved because it violates County wetland policies and land development regulations is

based on a total misconception of applicable law governing determinations of consistency with comprehensive plans and with the County's site plan approval criteria. It also ignores the fact that Lemon Bay had the ability to mitigate its mangrove impacts in the Pine Island Mitigation Bank. And as to Mr. Dodd's and Mr. Carlson's opinions of the value of TDUs, they are completely speculative, unsupported and unreliable even if relevant to determining economic harm under *Penn Central*.

### C. The Government's Argument That A Lucas Taking Requires Complete Deprivation of All Value Such That Residual Value Defeats The Claim Is Erroneous

*Lucas* holds that "where regulation denies all economically beneficial or productive use of land," a *per se* regulatory taking occurs without regard to the multi-factor *Penn Central* test that requires consideration of, among other factors, the economic impact on the claimant (as distinct from *Lucas* which requires deprivation of all economically beneficial or productive use of land). Here, the Government has not disputed that the Corp's permit denial deprived Lemon Bay of all economically beneficial or productive ***developmental use*** of both the Property and the rights to bulkhead and fill it. It is also does not dispute that without a permit, the Property has only nominal residual value. Instead, it argues that the existence of nominal residual value in the Property after the permit denial defeats Lemon Bay's *Lucas* claim because all value has not been eliminated. That is not the law.

There is no indication that the *Lucas per se* rule is dependent solely upon the concession by South Carolina that Lucas's property had no value. Indeed, the discussion of value is confined primarily to the facts and legal arguments presented. Under *Lucas*, once a claimant establishes deprivation of all economically use, the taking inquiry ends and a duty to compensate arises. That duty to compensate is not absolved if some residual value remains in the property. *See, Palazzolo*

*v. Rhode Island*, 533 U.S. 606, 609 (2001) ("[if] a taking is otherwise established, a State may not evade the duty to compensate on the premise that the landowner is left with a token interest."); *Lost Tree Village*, 787 F. 3d. at 1119.

Consideration of the value of the land relates to the ***amount of compensation*** to be paid for the taking; not whether a *Lucas*-type taking has occurred. And because land that has been deprived of all economically beneficial use will almost always have some residual value (for example, sale to the government or conservation group), value, while corroborative, is not, as the Government argues, dispositive of whether the land has been deprived of all economically or productive use.

Thus, to the extent courts have looked to value in analyzing whether there has been a *Lucas*-type taking, it has generally been as an indicator of whether there has been deprivation of all economically beneficial use; not as the *sine qua non* of a *Lucas*-type taking as the Government argues here. *See*, J. David Breemer, *Of Nominal Value: The Impact of Tahoe-Sierra on Lucas and the Fundamental Right to Use Property*, 33 ELR 10331, 10333 (2003). United States Supreme Court decision both before and after *Lucas* reinforce this conclusion.[7]  Notably the Court refers

---

[7] *Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980)("The application of a general zoning law to a particular property effects a taking if the ordinance does not substantially advance legitimate state interests…***or denies an owner economically viable use of his land***."); *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 734 (1997) ("regulation 'goes too far' and results in a taking 'at least [ ]in the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted' ") (emphasis in original);  *Lingle v. Chevron*, 544 U.S. 528, 538 (2005) ("A second categorical rule applies to regulations that completely deprive an owner of '***all economically beneficial use[e]***' of her property." (citing *Lucas*, 505 U.S. at 1019 (emphasis in original)) *Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980)("The application of a general zoning law to a particular property effects a taking if the ordinance does not substantially advance legitimate state interests…***or denies an owner economically viable use of his land***."); *see also Resource Investments, Inc. v. U.S.*, 85 Fed. Cl. 447, 486 (2009); *Florida Rock Industr. v. U.S.*, 18 F.3d 1560, 1567 (Fed. Cir. 1994); *Palm Beach Isles Assocs. v. United States*, 231 F.3d 1354 (Fed. Cir. 2000); *Lovelades Harbor, Inc. v. United States*, 28 F.3d 1171, 1176–77, 1179–83 (Fed. Cir. 1994).

only to "use" not to "use or value" or "use and value" in describing when a taking occurs; only "use." As such, these Supreme Court cases do not support the Government's argument that value is dispositive of a *Lucas*-type taking where the land has been deprived of all economically beneficial or productive development use.

While the court in *Lost Tree Village Corp*. v. U.S., 787 F. 3d 1111, 1116 (Fed. Cir. 2011) stated that a *Lucas* claim falls somewhere between the parties' respective interpretations that *Lucas* was about "use" versus "value, it did not further elaborate as to what exactly it meant other than to point to its precedent in *Loveladies Harbor, Inc. v. U.S.* 28 F. 3d 1171,1173 (Fed. Cir. 1994), the Federal Circuit equated a greater than 99% reduction in value of property (as we have here) to a deprivation of all economically feasible use under *Lucas*. *Id.* at 1173-75, 1181-82. Whatever may be the import of *Lost Tree Village* as to the use versus value issue, it most decidedly does not hold that nominal residual value after a permit denial defeats a *Lucas* claim where (as here) it is undisputed that the land has no economically beneficial or productive developmental use.

In the final analysis, acceptance of the Government's argument would mean that devisees, heirs or land owners with no or minimal basis in otherwise valuable property could never state a taking claim because the property will always retain some negligible residual value even where the regulation deprives the property of all economically beneficial developmental use. For precisely this reason, the Federal Circuit observed, "residual value does not defeat a categorial taking claim at least when residual value is not attributable to economic uses" because it would enable the Government '"to evade the duty to compensate  on the premise  that the landowner is left with a token interest."' *Lost Tree Village Corp. v. U.S,*  787 F. 3d 1111, 1116 (Fed. Cir. 2015) (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 629 {2001).

**D. The Government's Argument That Sale Of The Property Constitutes Economic Use Is Contrary To Court of Claims Caselaw**

The Government erroneously argues that Lemon Bay's ability to sell the Property is an economic use that precludes Lucas's *per se* treatment. However, "*Lucas* does not suggest that a land sale qualifies as an economic use." *Lost Tree Village*, 787 F. 3d at 1117.  To the contrary, the Federal Circuit in *Lost Tree Village* flatly rejected this argument holding that "[t]he government's argument incorrectly assumes that negligible noneconomic appraisal value enables a landowner to sell a regulated parcel."  *Id*. at 1117.  Here, the Government has produced no evidence that Lemon Bay could sell the Property "as is" without a Corps permit for anything other than nominal distressed value Indeed, Lemon Bay's expert economist, Henry H. Fishkind concluded that not even the State of Florida or conservation groups would be interested in purchasing the property for conservation purposes since it is too small and effectively already conserved by virtue of the Corp's permit denial.

But even if the Property's residual value enables Lemon Bay to sell the Property, the Federal Circuit in *Lost Tree Village* further rejected reliance upon sales of property as constituting economic use under the facts of this case holding:

> We disagree that all sales qualify as economic uses. When there are no underlying economic uses, it is unreasonable to define land use as including the sale of the land. Typical economic uses enable a landowner to derive benefits from land ownership rather than requiring a landowner to sell the affected parcel.

*Id.*

### E. The Government's Recoupment of Investment Based on Distressed, Non-Arm's Length Sales of the Property For Nominal Value Fails

The Government's "recoupment of investment" method of calculating economic injury relies upon subtracting the Property's value without a Corp permit from its distressed value before the permit denial (i.e., the Property's purchase price at a foreclosure sale).  Aside from the fact that

such sale price is hardly an arms-length transaction,[8] the Federal Circuit in *Lost Tree Village* rejected the argument that the property should be valued before the permit denial based on a depressed value that assumes the likelihood that the permit would be denied, stating:

> The government contends that the trial court should have subtracted Plat 57's value without a permit from Plat 57's demonstrated value before the permit denial (i.e., Plat 57's purchase price). We disagree. Plat 57's value with a permit reflects Plat 57's "highest and best use." The highest and best use of a parcel is "the reasonably probable and legal use of vacant land or improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." Olson, 292 U.S. at 255, 54 S.Ct. 704. As the trial court understood, the government cannot rely on the regulatory taking at issue to reduce the fair market value of an affected parcel. See Fla. Rock Indus., Inc. v. United States, 791 F.2d 893, 905 (Fed.Cir.1986).

*Id*. at 1118.

### F. The Government's Argument That Conservation is a Use with Economic Value in Charlotte County and that TDUs Must Be Considered under A Lucas Takings Analysis Lacks Both Legal and Evidentiary Support

The Government has argued that "Lemon Bay's Property retains substantial value from TDUs even after the permit denial," arguing that the Property's location and characteristics mean that it can be used for conversation purposes at a value of $570,000. However, even assuming that

---

[8] It is disingenuous for the Government to characterize the foreclosure sale bid price of $15,200 as a "competitive sale" reflecting a fair market value, particularly in light of the fact that it has pointed to no evidence as to the existence of other bids or any other evidence that would support this characterization. *See, e.g. Century Group, Inc. v. Premier Fin. Svcs., L.P.*, 724 So. 3d 66 (Fla. 3d DCA 1999) (noting that "the amount bid at a foreclosure sale does not conclusively establish market value of the property for purposes of a deficiency decree."). Indeed, the Government doubles down on this intellectual stretch in arguing that IHT's purchase price is consistent with Mr. LeFave's purchase price in 1993. However, Mr. LeFave acquired the property through *tax deed sales* representing the purchase price of just the payment of the *ad valorem* taxes on the Property. The purpose of a tax deed sale is to obtain payment of delinquent ad valorem taxes. *See, e.g. Delta Prop. Mgmt. v. Profile Investments, Inc*., 87 So. 3d 765 (Fla. 2012) (citing section 197.332(1), Florida Statutes (1999)). "There is no correlation between the [tax] sale price and the value of the property. Therefore, it will be a rare case where the taxes paid at a tax sale will approximate the actual value of the property." *In re McKeever*, 166 B.R. 648 (Bankr. N.D. Ill. 1994).

the Property's value after the taking is relevant to a *Lucas* taking, the Government's argument fails for various other reasons.  *Lucas*'s focus is on **developmental** use of the property alleged to have been taken.[9]  It is undisputed that without a Corps permit, the Property has no economically beneficial developmental use. Lemon Bay's tentative ability to potentially perfect, sell and transfer residential development rights to third parties for their use in developing their properties does not constitute a **developmental** use of the Property. It requires that the Property remain in its natural undeveloped state.  Thus, the potential availability of TDUs is irrelevant to a *Lucas* taking, and the Government's argument must be rejected.  Confirming this view, Justice Scalia, in his concurring opinion in *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 747 (1997), stated:

> TDRs, of course, have nothing to do with the use or development of the land to which they are (by regulatory decree) "attached." The right to use and develop one's own land is quite distinct from the right to confer upon someone else an increased power to use and develop his land). In his words, [p]utting TDRs on the taking rather than the just compensation side of the equation…is a clever, albeit transparent, device that seeks to take advantage of a peculiarity of our Takings Clause jurisprudence.

*Id*. at 747-48.  "The cleverness of the scheme… is that it causes the payment to come, not from the government *but from third parties*—whom the government reimburses for their outlay by granting them (as the TDRs promise) a variance from otherwise applicable land-use restrictions." *Id*. at 748 (emphasis in original).

In the final analysis, the Government's argument is a transparent attempt to hide the Corp's

---

[9] It equated economically beneficial use with "habitable or productive **improvements**" to the land. and noted that **building** a home on the land is an "essential use of land." 505 U.S. at 1031 (emphasis supplied); *Id*. at 1025, n. 12 (referring to "all **developmental** or economically beneficial land uses") (emphasis supplied); also see, *Nollan v. California Coastal Commission*, 438 U.S. 825 (1987) (United States Supreme referred to "the right to build on one's property" as something inherent to land ownership); *Palazzolo v. Rhode Island*, 533 U.S. 606, 631 (2001) (United States Supreme Court found no taking under *Lucas* because the subject property retained $200,00 worth of "**development value**.").

taking by cloaking it behind the potential to secure a highly speculative, noneconomic credit from a third-party government agency and to then receive payment from a third party developer all in exchange for the loss of all economically beneficial or productive use of the Property (i.e., the *res*). Acceptance of the Government's argument would effectively extinguish the most fundamental of all rights in real property; namely the right to use it. That is not and should not be the law. *See, Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980) ("[A] State, by *ipse dixit*, may not transform private property into public property without compensation"); *Palazzolo v. Rhode Island*, 533 U.S. 606, 609 (2001) ("[If] a taking is otherwise established, a State may not evade the duty to compensate on the premise that the landowner is left with a token interest.").

The Government has cited *Penn Central* as "binding precedent" for defeating a *Lucas*-type taking based on the availability of TDUs. The Government mischaracterizes *Penn Central*'s holding. First, the regulations in *Penn Central* were not upheld because of the availability of TDUs, but rather because *Penn Central* already enjoyed economically beneficial use of its property.  Thus, its discussion of TDUs is *dictum*. Second, even if not *dictum*, *Penn Central* did not address whether TDUs must be considered in determining whether a regulation deprives a landowner of all economically beneficial use under *Lucas*. That issue was not before the Court. Rather, *Penn Central*'s reference to TDUs related their potential to mitigate the economic impact of the regulation under the first prong of its multi-factor test; not whether the availability of TDUs prevented a *Lucas*-type taking where the regulation deprives a landowner of all economically beneficial or productive use. Moreover, the facts of *Penn Central* are materially distinguishable from the facts of this case. Here, it is undisputed that the Corp's permit denial deprives Lemon Bay the ability to develop its property in an economically beneficial or productive manner. It is also undisputed that Lemon Bay, unlike the landowner in *Penn Central*, has no other property to

transfer density to.  As Justice Scalia further observed in his concurrence in *Suitum.*

> [Penn Central] can be distinguished from the case before us on the ground that it was applied to landowners who owned at least eight nearby parcels, some immediately adjacent to the terminal, that could be benefited by the TDRs...The relevant land, it could be said, was the aggregation of the owners' parcels subject to the regulation (or at least the contiguous parcels); and the use of that land, as a whole, had not been diminished. It is for that reason that the TDRs affected "the impact of the regulation."... If *Penn Central* 's one-paragraph expedition into the realm of TDRs were not distinguishable in this fashion, it would deserve to be overruled. Considering in the takings calculus the market value of TDRs is contrary to the import of a whole series of cases, before and since, which make clear that the relevant issue is the extent to which use or development of the land has been restricted. Indeed, it is contrary to the whole principle that land-use regulation, if severe enough, can constitute a taking which must be fully compensated.

*Suitum*, 520 U.S. at 749.

> **G. Even if the Potential Value of TDUs Must Be Considered In Determining The "After" Value of the Property, There Is No Competent Evidence That The Potential For Sale of TDUs From The Property Actually Contributes To Its Value**

As previously discussed, the Government's TDU value argument relies exclusively upon the opinion of William Carlson who in turn relies exclusively on, and is acting as a conduit for the wildly speculative, unsupported and unreliable opinion of Andrew Dodd.  Mr. Dodd is not a licensed real estate appraiser. His and thus Mr. Carlson's TDU value opinions will be the subject of *Daubert* motions.  But even assuming the admissibility of their TDU value opinions, there is no testimony or evidence that the value of the 42 TDUs, actually contributes to the value of the Property itself. The sales data relied upon by Mr. Dodds were sales of TDUs; not sales of land purchased for purposes of sale and transfer of TDUs. Indeed, there is no evidence whatsoever in this case of sales of land whose prices reflect the value of the potential to sell and transfer TDUs.

Mr. Carlson relied exclusively upon Mr. Dodds' opinion of the value of TDUs. He did not perform an independent analysis of TDU sales data. He concedes that his $570,000 value is of the

42 TDUs; not the Property itself.  He also opines that "the TDUs do not contribute value to the real estate." In his words, "[t]he real estate has its value and the TDUs [have] their values."   Thus, he emphasized that it was not his opinion that someone would pay $570,000 for the Property "as is." In short, there is no appraisal evidence in this case to support the Government's claim that the potential sale of TDUs from the Property enhances its value beyond a nominal value.

### H. The Government Cannot Refute or Diminish Lemon Bay's Rights to Bulkhead and Fill under Florida Law

#### i. *Bulkhead and Fill Rights That Vested Prior To The Effective Date Of The Bulkhead Act Were Not Repealed; Rather They Were Expressly Preserved and Ratified In All Respect*

The Government has arged the repeal of statutory provision providing for the rights to bulkhead and fill sovereignty submerged lands conveyed by the Trustees divested Lemon Bay's predecessor pursuant to Laws of 1957, c. 57- 362, § 10, known as the "Bulkhead Act." This argument fails.   The very section of the Bulkhead Act cited by the Government completely refutes its argument. It states:

> Sections 253.06 through 253.11, 253.13, 253.15, Florida Statutes, are repealed and all laws and parts of laws in conflict herewith be and the same are hereby *repealed but this act shall not be construed to  be in conflict  with any general or special law whereby the state of Florida has divested itself of title to submerged land or has granted such title to another*.

Laws of 1957, c. 57-362, § 10. (emphasis supplied).

It is undisputed that the Property was conveyed by the Trustees into private hands in 1954 pursuant to general law granting the rights to bulkhead and fill.  Thus, the Government's construction of the Bulkhead Act "conflict[s] with [a] general...law whereby the state of Florida has divested itself of title to submerged land or has granted such title to another." Additionally, Section 253.12(2), Florida Statutes (1957), which both preexisted and survived enactment of the Bulkhead Act, provides that:

> All conveyances of sovereignty lands heretofore made by the trustees of the internal improvement trust fund of Florida subsequent to the enactment of chapter 6451, acts of 1913, and chapter 7304, acts of 1917, are hereby ratified, confirmed, and validated in all respects.

Again, it is undisputed that Property was conveyed by the Trustees in 1954 subsequent to enactment of the 1913 and 1917 Acts. Ratification, confirmation, and validation of this conveyance "in all respects" plainly, unambiguously and necessarily means that section 253.12(2) also preserved the special riparian right to bulkhead and fill which accompanied the Trustees' 1954 conveyances of the Property.

Furthermore, Florida Supreme Court precedent makes clear that the Bulkhead Act could not retroactively divest Lemon Bay's predecessor of any rights that had previously vested absent clear legislative intent that the Act apply retrospectively.[10] No such expression of legislative intent appears on the face of the Bulkhead Act and the Government cites none. Indeed, former section 253.15 expressly established the method of bulkheading and filling with reference to section 309.01, Florida Statutes. Section 309.01 is still on the books thereby clearly evidencing the Legislature's intent not to repeal bulkhead and fill rights that vested prior to enactment of the Bulkhead Act.

The rule against retroactive application applies with particular force where, as here, such application would impair or destroy existing rights. *Alamo Rent-a Car Inc. v. Mancusi*, 632 So. 2d 1352 (Fla. 1994). And even if the Legislature clearly states that a substantive statute is to apply

---

[10] The Florida Supreme Court has held that it will not divine a legislative intent that a new law be applied to disturb existing contractual rights when there is no express indication that such is the legislative intent. *Hassen v. State Farm Mutual Auto Ins. Co.*, 674 So. 2d 106 (Fla. 1996). The basis for retrospective application must be unequivocal and leave no doubt as to the legislative intent. *Larson v. Independent Life and Accident Ins. Co.*, 29 So. 2d 448 (Fla. 1947). Express declaration to the effect of the intent that the statute apply retrospectively must appear on the face of the statute. *Fleemon v. Case*, 342 So. 2d 815 (Fla. 1976).

retroactively, Florida courts refuse to do so where, as here, it would impair the obligations of contract or vested rights. *State Farm Mut. Auto Ins. Co. v. LaForet*, 658 So. 2d 55 (Fla. 1995).

The Government's argument is further refuted by Florida and federal precedent post-dating the effective date of the Bulkhead Act. These cases recognize the continued existence of the bulkhead and fill rights accompanying sovereignty submerged lands conveyed by the Trustees prior to the effective date of the Bulkhead Act. *Palm Beach Isles Assoc., v. U.S.*, 208 F.3d 1374, 1381 (Fed. Cir. 2000) (finding that Court of Federal Claims erred in finding no categorical taking where plaintiff had right to dredge and fill property under state law and denial of permit took all economically viable use of the property by hindering that right); *Zabel v. Pinellas County Water & Navigation Authority*, 171 So. 2d 376, 381 (Fla. 1965) (confirming denial of permit to fill 11.5 acres of submerged lands conveyed by TIITF to expand trailer park constituted a taking); *State Dept. of Envir. Regulation v. Oyster Bay Estates, Inc.*, 384 So.2d 891, 895 (Fla. 1st DCA 1980) ("[T]he State cannot, after selling submerged land to private owners, then deny to such owners the right to use those lands in the only way in which private ownership can be of any value.").

## ii. *Lemon Bay's Bulkhead and Fill Rights Are Riparian Rights Subject to Takings Clause*

The Florida Supreme Court has confirmed that the statutory right to bulkhead and fill is a special riparian right. *Trustees of Internal Improvement Fund v. Claughton*, 86 So. 2d 775, 789 (Fla. 1956). In *Claughton*, the Court described the statutory right to bulkhead and fill submerged lands conveyed by the Trustees into private hands under the 1917 Act as a "'***special riparian right***' to fill in and bulkhead the lands actually granted by the Trustees under the authority of the…1917 Act, which '***special riparian right***' was clearly necessary [in] order to reclaim these lands and [turn] them into useful property." (emphasis supplied).

However, regardless of the title, Lemon Bay's bulkhead and fill rights constitute valuable

property that accompanies, and is appurtenant to the submerged lands with which they are associated. In *Zabel v. Pinellas County Water & Navigation Authority*, 171 So. 2d 376 (Fla. 1965), the Florida Supreme Court held that the sale of submerged land by the Trustees under the 1917 Act "expressly carried with it the right to bulkhead and fill" and "is presumptively valid and based on the determination by the Trustees that the public interest would not be impaired." *Id.* at 380. According to the Court, "the statutory rights to dredge, fill and bulkhead the land, subject to reasonable limitations, are [the landowner's] only present rights attributable to ownership of the submerged land itself," and constitute "'property' in the Fourteenth Amendment to the U.S. Constitution [that] includes the right to *acquire, use and dispose* of it for lawful purposes, and the constitution protect each of these essentials.'" *Id.* at 381 (quoting *Kass v. Lewin*, 104 So. 2d 572, 578 (Fla. 1958)) (emphasis original). According to the Florida Supreme Court, such rights may not be taken without compensation. *Id.* at 381. The United States Supreme Court has similarly so held. *Appleby v. New York*, 271 U.S. 364, 399 (1926) (concluding that "Appleby and Latou were vested with the fee simple title in the lots conveyed, and with a grant of wharfage at the ends of the lots on the river …and that the city can only be revested with that by a condemnation of the rights granted.").

### iii. Lemon Bay's Right to Bulkhead and Fill is a Separate and Distinct Right Subject to the Government's Taking

The Government has argued, citing Penn Central's "parcel as a whole" language that Lemon Bay does not have claims for a the taking of the special riparian right to bulkhead and fill the Property separate and apart from its claim of a taking of underlying real estate. Its argument relies upon language in *Penn Central* and *Tahoe-Sierra* to the effect that where an owner possesses a full bundle of property rights, the destruction of one strand of the bundle is not a taking. This argument does not reach a *Lucas* taking claim. Moreover, it is a transparent attempt to avoid the

inconvenient fact that the County's TDU program does not provide for the transfer of bulkhead and fill rights and, thus, cannot rescue the Government from a claim that these rights have been taken. Furthermore, it misapprehends the distinct nature and separate appurtenant, severable character of these special riparian rights and similar rights under Florida law. In *Zabel*, the Florida Supreme Court characterized Lemon Bay's bulkhead and fill rights as follows:

> The statutory rights of the appellants to dredge, fill and bulkhead the land, subject to reasonable limitations, are appellants' only present rights attributable to ownership of the submerged land itself. Those rights may not be arbitrarily denied and the owners deprived of the only beneficial use of their property without compensation.

171 So. 2d at 381. Further characterizing these rights, the Florida Supreme Court concluded in *Caples v. Taliaferro*, 197 So. 861, 862 (Fla. 1940) that "[i]t is settled law in this country that a riparian owner may separate his uplands from his submerged lands and convey both to different grantees, or he may sell one and withhold the other."[11] Finally, the United States Supreme Court and this Court have recognized the separate severable nature of riparian rights. *See Stop the Beach Renourishment, Inc. v. Florida Dept. of Environmental Regulation,* 560 U.S. 702, 713 (2010) ("The Takings Clause…applies as fully to the taking of a landowner's riparian rights as it does to the taking of an estate in land" (citing *Yates v. Milwaukee*, 10 Wall. 497, 504 (1871)); *see also*

---

[11] *See also Brickell v. Trammell*, 82 So. 221 (Fla. 1919) (riparian rights are property rights that may not taken without just compensation.); *Broward v. Mabry*, 50 So. 2d 826, 830 (Fla. 1909) (riparian rights "are easements incident to the riparian holdings, and are property rights that may be regulated by law, but may not be taken without just compensation and due process of law".); *Walton County v. Stop Beach Renourishment, Inc.,* 998 So. 2d 1102, 1111 (Fla. 2008) (same); *Lee County v. Kiesel*, 705 So.2d 1013, 1015–16 (Fla. 2d DCA 1998) (upland owners were entitled to compensation because bridge substantially and materially obstructed their littoral right to view); *Thiesen v. Gulf, Florida & Alabama Railway Co*., 78 So. 491, 506–07 (1918)(rejecting notion that littoral rights could be eliminated without compensation); *Game & Fresh Water Fish Comm'n v. Lake Islands, Ltd*., 407 So.2d 189 (Fla.1981) (holding that boating regulation was unconstitutional as to littoral owner because it substantially denied the right of access); see also *Webb v. Giddens*, 82 So.2d 743 (Fla.1955) (finding that culvert substantially impaired littoral owner's right of access)

*Mildenberger v. U.S.*, 91 Fed. Cl. 217, 244 (2010) (acknowledging Florida Law). Thus, contrary to the Government's *Penn Central* "parcel as a whole" argument, Lemon Bay has separate causes of action for the taking of the special riparian right to bulkhead and fill the Property.

### iv.   The Government's Argument That Lemon Bay Has No Bulkhead and Fill Rights Because They Expired Due To Non-Use Or Lemon Bay Owns No Adjacent Uplands Completely Lacks Merit

The Government has also argued that Lemon Bay's bulkhead and fill rights are technically statutory rather than traditional riparian rights and that the Property does not include uplands sufficient to implicate traditional riparian rights. These arguments fail. First, in characterizing the bulkhead and fill rights "as a form of property," the Court in *Zabel* cited *Brickell v. Trammel*, 82 So. 223 (Fla. 1919) (holding that riparian rights are property rights). *See also Trustees of Internal Improvement Fund v. Claughton*, 86 So. 2d 775, 789 (Fla. 1956) (Florida Supreme Court characterizing the statutory right to bulkhead and fill submerged lands conveyed by the State as a " '***special riparian right'*** to fill in and bulkhead the lands actually granted by the Trustees under the authority of the…1917 Act. (emphasis supplied). The courts made no distinction between the two for takings analysis purposes for obvious reasons. The Government's distinction is a distinction without difference for takings analysis purposes.

Second, whether the source of an appurtenant real property right is the common law or statute, or whether it is a "traditional" or "special" riparian right does not alter the legal status of the right as a vested appurtenant property right running with the land protected by the Fifth Amendment. Third, whether the Property includes sufficient uplands to invoke traditional riparian rights is irrelevant since the "the statutory rights of the appellants to dredge, fill and bulkhead the land…are appellants' ***only*** present rights attributable to ownership of the submerged lands itself, *Zabel*, 171 So. 2d at 38, and are "clearly necessary [in] order to reclaim these lands and [turn] them

into useful property." *Claughton*, 86 So. at 789.   Thus, **by their very nature,** such rights are appurtenant to and must run with the submerged lands conveyed regardless of whether they include sufficient uplands.   Indeed, the Government's argument is squarely refuted by section 253.15 which expressly provided that:

> In case any island or submerged lands are sold by the Trustees, according to the provisions of §§ 253.12 and 253.13, the purchaser **shall have the right to bulkhead and fill in same, as provided by §309.01, without, however, being required to connect the same with the shore** or with a permanent wharf.

(emphasis supplied). Moreover, the Property includes a small sliver of uplands abutting the Beach Road right-of-way.

The Government has further suggested that the statutory rights to bulkhead and fill would expire if not exercised prior to the effective date of repeal of section 253.215 in 1957.   As previously argued, the Bulkhead Act expressly "ratified, confirmed and validated in **all** respects" prior conveyances of submerged lands without subjecting them to expiration due to non-use. Moreover, the Government's argument cannot be squared with section 253.15's express reference to section 309.01, Florida Statutes, specifying the manner in which bulkheading and filling is to occur, which remains part of Florida Statutes to this day.   Clearly, if the Bulkhead Act repealed all previously vested but unexercised bulkhead and fill rights, the Legislature would not have retained section 309.01 as current statutory law. That it did evidences clear intent that previously vested rights to bulkhead and fill were to survive repeal of section 253.15.

I. ***Under Ciampetti v. US*, The Government Cannot Attempt To Defeat Lemon Bay's *Lucas* Or *Penn Central* Taking Claims By Arguing That Diminution Of Value Already Occurred As A Result Of The County's Wetland Regulations**

The Government has also attempted to defeat both Lemon Bay's *Lucas* and *Penn Central* taking claims by pointing to certain County comprehensive plan policies and land development

regulations which limit development in wetlands and require site plan approval which the Government contends the County would likely deny. The Government's argument appears to be that: (1) the County has created an impediment to development by enacting its wetland policies and regulations; (2) the County's actions cannot be imputed to the Corps; (3) therefore, the Government cannot be liable for a taking when the Corps denied Lemon Bay's § 404 permit. This Court rejected the almost identical argument in *Ciampetti v. U.S.*, 18 Cl. Ct. 548, 555 (Fed. Cl. 1989) explaining "the federal government retains independent control over its own regulatory action...the process for obtaining a permit under 404 beings and ends with the Corps" As explained by this Court:

> Assuming that no economically viable use remains for the property, the Constitution could not countenance a circumstance in which there was no fifth amendment remedy merely because two government entities acting jointly or severally caused a taking.

*Id.* at 556.

Here, as in *Ciampetti*, the Corps made their own separate, independent, merits-based decision to deny Lemon Bay's § 404 permit. And here, as in *Ciampetti*, this Court should reject the Government's attempt to defeat Lemon Bay's *Lucas* and *Penn Central* taking claims by pointing to the County's wetland policies and regulations as the reason why the Property's value is nominal before the alleged takings.

### III.    Certificate of Service

**I HEREBY CERTIFY**, that a true and correct copy has been furnished via email this 27th day of April, 2020, to Frank Singer, Environment & Natural Resources Division, U.S. Department of Justice, frank.singer@usdoj.gov, and Claudia Hadjigeorgiou, Claudia.hadjigeorgiou@usdoj.gov.

SMOLKER, BARTLETT, LOEB,
HINDS & THOMPSON, P.A.

By: */s/ David Smolker*
DAVID SMOLKER (counsel of record)
Florida Bar No.: 349259
davids@sblfirm.com
allisond@sblfirm.com
SMOLKER, BARTLETT, LOEB,
HINDS AND THOMPSON, P.A.
100 North Tampa Street, Suite 2050
Tampa, Florida 33602
Tel. 813-223-3888
*Attorney for Plaintiff*