IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| LEMON BAY COVE, LLC, | ) | Case No. 17-436 L |
|  | ) |  |
| Plaintiff, | ) | Senior Judge Mary Ellen Coster Williams |
|  | ) |  |
| v. | ) | *Electronically filed on May 26, 2020* |
|  | ) |  |
| THE UNITED STATES OF AMERICA, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

UNITED STATES' PRE-TRIAL MEMORANDUM
OF CONTENTIONS OF FACT AND LAW

TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ....................................................................................... 1

II.     STATEMENT OF FACTS ............................................................................................. 2

III.    ISSUES OF FACT AND LAW ..................................................................................... 12

IV.     DISCUSSION ............................................................................................................... 13

        A.      The Corps' denial of Plaintiff's section 404 permit application for a residential
                development on submerged lands and wetlands does not constitute a regulatory
                taking under *Penn Central*. .................................................................................. 14

                1.      Plaintiff cannot proffer evidence of reasonable investment-backed
                        expectations based on its predecessor-in-interest's loan to yet another
                        predecessor-in-interest. .......................................................................... 15

                2.      The government's interest in protecting valuable wetlands and submerged
                        lands measured against Plaintiff's interest in an ever-changing proposal
                        for residential development militates against a finding of a regulatory
                        taking....................................................................................................... 20

                3.      The economic impact of the Corps' section 404 permit denial is not
                        sufficient to constitute a regulatory taking................................................ 23

        B.      The Corps' denial of Plaintiff's section 404 permit for a residential development
                on submerged lands and wetlands did not deprive the property of all economic
                beneficial use. ........................................................................................................ 26

        C.      Plaintiff's claim to bulkhead and fill cannot be segregated from the property for
                takings analysis and, in any event, is subject to regulation. ................................. 30

V.      CONCLUSION............................................................................................................... 33

TABLE OF AUTHORITIES

<u>Federal Cases</u>

*Am. Pelagic Fishing Co. v. United States*,
    49 Fed. Cl. 36 (2001) ........................................................................................ 21

*Anaheim Gardens*, *LP v. United States*,
    953 F.3d 1344 (Fed. Cir. 2020) .................................................................... 15, 16

*Arctic King Fisheries, Inc. v. United States*,
    59 Fed. Cl. 360, 375 (2004) ............................................................................. 23

*Bass Enters. Prod. Co. v. United States*,
    381 F.3d 1360 (Fed. Cir. 2004) ........................................................................ 14

*Brace v. United States*,
    72 Fed. Cl. 337 (2006) ........................................................................ 20, 21, 22

*Ciampetti v. United States*,
    18 Cl. Ct. 548 (1989) .................................................................................. 24, 25

*Cienega Gardens v. United States*,
    331 F.3d 1319 (Fed. Cir. 2003) ........................................................................ 15

*Concrete Pipe and Prods. of Calif., Inc. v. Constr. Laborers' Pension Trust for S. Calif.*,
    508 U.S. 602 (1993) ......................................................................................... 30

*Deltona Corp. v. United States*,
    657 F.2d 1184 (Ct. Cl. 1981) ........................................................................... 16

*Fla. Rock Indus., Inc. v. United States*,
    18 F.3d 1560 (Fed. Cir. 1994) .......................................................................... 23

*Fla. Rock Indus., Inc. v. United States*,
    791 F.2d 893 (Fed. Cir. 1986) .......................................................................... 21

*Fordyce v. United States*,
    7 Ct. Cl. 591 (1985) ......................................................................................... 24

*Forest Props. Inc. v. United States*,
    177 F.3d 1360 (Fed. Cir. 1999) ........................................................................ 31

*Forest Props., Inc. v. United* States,
    39 Fed. Cl. 56 (1997) ....................................................................................... 21

*Good v. United States*,
    39 Fed. Cl. 81 (1997) .................................................................................. 19, 28

*Hydaburg Co-op Ass'n v. United States*,
    667 F.2d 64 (Ct. Cl. 1981) .......................................................... 22

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005).................................................................. 20

*Loesch v. United States*,
    645 F.2d 905 (Ct. Cl. 1981) ...................................................... 14

*Lost Tree Vill. Corp. v. United States*,
    787 F.3d 1111 (Fed. Cir. 2015)................................................ 27

*Loveladies Harbor, Inc. v. United States*,
    21 Cl. Ct. 153 (1990) ................................................................ 23

*Loveladies Harbor, Inc. v. United States*,
    28 F.3d 1171 (Fed. Cir. 1994).............................................. 19, 23

*Lucas v. S.C. Coastal Council*,
    505 U.S. 1003 (1992)................................................ 13, 14, 27, 29

*Maritrans, Inc. v. United States*,
    342 F.3d 1344 (Fed. Cir. 2003)................................................ 20

*Mehaffy v. United States*,
    102 Fed. Cl. 755 (2012) ............................................................ 20

*Mehaffy v. United States*,
    499 F. App'x 18 (Fed Cir. 2012) .............................................. 19

*Murr v. Wisconsin*,
    137 S. Ct. 1933 (2017).............................................................. 16

*Norman v. United States*,
    429 F.3d 1081 (Fed. Cir. 2005)................................................ 15

*Pa. Coal Co. v. Mahon*,
    260 U.S. 393 (1922).................................................................. 13

*Palazzolo v. Rhode Island*,
    533 U.S. 606 (2001)............................................................ 18, 19

*Penn Cent. Transp. Co. v. New York City*,
    438 U.S. 104 (1978)........................................................ 13, 27, 28, 30

*Res. Invs., Inc. v. United States*,
    114 Fed. Cl. 639 (2014) ............................................................ 22

*Res. Invs., Inc. v. United States,*
    85 Fed. Cl. 447 (2009) ................................................................. 22

*Ruckelshaus v. Monsanto Co.,*
    467 U.S. 986 (1984)................................................................... 16

*St. Bernard Parish Gov't v. United States,*
    887 F.3d 1354 (Fed. Cir. 2018).................................................. 25

*Suitum v. Tahoe Reg'l Planning Agency,*
    520 U.S. 725 (1997)................................................................... 28

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,*
    535 U.S. 302 (2002).............................................................. passim

*United States ex rel. Tenn. Valley Auth. v. Powelson,*
    319 U.S. 266 (1943)................................................................... 24

*United States v. 25.202 Acres of Land,*
    860 F. Supp. 2d 165 (N.D.N.Y. 2010) ...................................... 25

*United States v. 69.1 Acres of Land,*
    942 F.2d 290 (4th Cir. 1991) ..................................................... 25

*United States v. Riverside Bayview Homes, Inc.,*
    474 U.S. 121 (1985)................................................................... 21

<u>State Cases</u>

*Caples v. Taliaferro,*
    197 So. 861 (Fla 1940).............................................................. 31

*Graham v. Estuary Props., Inc.,*
    399 So.2d 1374 (Fla. 1981)........................................................ 32

*Martyn v. First Fed. Sav. & Loan Ass'n of W. Palm Beach,*
    257 So.2d 576 (Fla. Dist. Ct. App. 1971) ................................. 18

*Trs. of the Internal Improvement Fund v. Claughton,*
    86 So. 2d 775 (Fla. 1956).......................................................... 31

*Zabel v. Pinellas County Water & Navigation Control Auth.,*
    171 So. 2d 376 (Fla. 1965)................................................... 31, 32

<u>U.S. Constitution</u>

U.S. Const. amend. V................................................................................. 13

Federal Statutes

33 U.S.C. § 1251 .................................................................................................... 16

State Statutes

Fla. Stat. § 253.15 (1955) ...................................................................................... 31

Fla. Stat. Ann. § 373.4131 (West 2020) ............................................................... 16

Fla. Stat. Ann. § 373.414 (West 2020) ................................................................. 16

Fla. Stat. Ann. § 697.01 (West 2020) ................................................................... 18

Fla. Stat. Ann. § 702.06 (West 2020) ................................................................... 18

Miscellaneous Authorities

Interagency Land Acquisition Conference, Uniform Appraisal Standards for Federal Land
        Acquisitions (6th ed. 2016) .......................................................................... 25

Permits for Activities in Navigable Waters or Ocean Waters,
        39 Fed. Reg. 12,115-01 (Apr. 3, 1974) ........................................................ 16

I.      PRELIMINARY STATEMENT

Plaintiff's attempt to convert a 2010 purchase of wetlands and submerged lands for $15,200 into a 2016 takings claim worth nearly $3.9 million lacks merit.  The takings clause is not a bulwark for failed real estate speculation.  Plaintiff's predecessor-in-interest purchased the property in 2010 for $15,200 at a foreclosure sale.  The foreclosed owner purchased the property in a tax sale in 1993 for $12,100.  The property was sold at a tax sale because the previous owner, also a real estate developer, parceled out the submerged lands and wetlands and stopped making property tax payments on them.  These transactions reflect what Plaintiff's and its predecessors' own consultants specifically advised: development of the property was extremely unlikely.

Plaintiff cannot show that the U.S. Army Corps of Engineers' ("Corps") denial of a permit application to fill waters of the United States under section 404 of the Clean Water Act tips even one of the three factors that inform regulatory takings inquiries in Plaintiff's favor. First, Plaintiff cannot show that it possessed reasonable investment-backed expectations in developing its property for a multi-unit single-family residential development, much less that the Corps' permit denial frustrated such expectation.  Second, Plaintiff cannot show that its hope to develop a block of single-family homes overcomes the Corps' well-established and important public interest in protecting the waters of the United States from unnecessary encroachment. And third, Plaintiff cannot make a competent showing that the Corps' permit denial imposed a negative economic impact because Plaintiff's proffered evidence of that impact is fanciful and incomplete.

Perhaps aware of these inadequacies under these three *Penn Central* factors for regulatory takings, Plaintiff attempts to skirt these issues by asserting a categorical taking of its

property.  But this maneuver fails, as Plaintiff cannot show that the Corps' permit denial triggered the relatively rare situation and extraordinary circumstance where regulation deprives a landowner of *all* economically beneficial use of land.  To the contrary, the unique ecological characteristics of Plaintiff's property make the property eligible for participation in the local county's conservation program.  Participation in this program increases the value of the property well beyond Plaintiff's $15,200 purchase price.  This value disqualifies consideration of a categorical taking.

Also unavailing is Plaintiff's focus on a statutory right under Florida state law to bulkhead and fill.  As a matter of law, Plaintiff's efforts to divorce that statutory right from the police power and to segregate it for a stand-alone takings analysis are erroneous.

At the conclusion of trial, this Court should enter judgment for the United States on Plaintiff's varied takings claims.

II.    STATEMENT OF FACTS

Trial will establish the following facts:

1.  The property, which comprises three separate parcels, consists of 5.64 acres of submerged lands, high quality forested mangrove wetlands, and small upland regions on Sandpiper Key in Charlotte County, Florida.

2.  The property includes tidal flats and open water and serves as a habitat for various birds and fish, as well as several threatened or endangered species, including the West Indian manatee and sea turtles.

3.  Lemon Bay, the water body that abuts the property, is classified as an Aquatic Preserve and an Outstanding Florida Water.

4.  The property was originally held as sovereign land by the State of Florida.

5. In 1954, Mr. Earl Farr purchased a tract of land (*i.e.,* the "parent tract") from the Florida Board of Trustees for the Internal Improvement Trust Fund ("Trustees"), a portion of which land included the property at issue in this lawsuit.  The parent tract encompasses all of Sandpiper Key and certain contiguous submerged lands.

6. Mr. Farr sold the parent tract to Mr. John Stanford in 1955.

7. Mr. Stanford had the parent tract platted and was granted a permit from Charlotte County authorities to deposit spoil and dredge materials on the lot.

8. In 1961, Mr. Stanford received permits from the Corps and the Trustees to fill portions of the parent tract.

9. By 1970, the northwest portion of the parent tract had been filled, but the portion of the parent tract that constitutes the property in this lawsuit remained unfilled and undeveloped.

10. In 1973, Charlotte County vacated the original plat for the portion of the parent tract located east of State Road 776 ("Beach Road"), including the property at issue, converting thirty-seven platted lots into eight larger numbered parcels.

11. In 1979, Mr. Stanford sold these eight parcels of the parent tract, including the property at issue.

12. In 1980, Sandpiper Key Associates acquired these eight parcels.

13. Sandpiper Key constructed a condominium development on the northwest portion of the parcels that had been previously filled.  But Sandpiper Key left undeveloped the southern wetland areas containing the property at issue in this lawsuit.

14. Starting in the early 1990's, Sandpiper Key stopped paying real estate taxes on the undeveloped portion of the eight-lot tract, which includes the property at issue in this lawsuit.

15. In August of 1993, Charlotte County sold this undeveloped land at a tax sale to Mr. Gerald LeFave for $12,100.

16. Mr. LeFave sought to develop the property beginning in 2007.

17. Mr. LeFave hired DMK Associates ("DMK") and Ecological Services Associates ("ESA") to assist in acquiring permit approvals for his proposed development: a 39-unit condominium project called "The Verandahs at Lemon Bay."  DMK is a Florida engineering firm specializing in site development preparation and surveying; ESA is an environmental consulting firm.

18. Mr. LeFave's development proposed thirty-nine condominium units and a boat ramp that would have required removing almost all mangroves on the property, constructing a bulkhead, and filling a portion of the property.  To construct this development, Mr. LeFave needed authorizations from Charlotte County, the Southwest Florida Water Management District ("Water Management District"), and the Corps.

19. In initial discussions held around 2007, DMK informed Mr. LeFave that the property development "would not be easy to permit because of the impacts of the wetlands" and that "there [were] a lot of issues that would have to be overcome to get the permits."  Ex. 27, 35:8-17 (ECF No. 47-7).

20. In November 2007, Mr. LeFave obtained preliminary approval from Charlotte County authorities for his development, subject to numerous conditions, including permit approval from the Corps.

21. After reviewing Mr. LeFave's project, the Charlotte County Manasota and Sandpiper Key Architectural Review Committee recommended that the project be denied.  In particular, the Committee found that the development was inconsistent with the "no-fill" ordinance within the Zoning District Overlay Code.  Ex. 36 (citing Charlotte Cty., Fla., Code of Ordinances § 3-9-53(g)(10)) (ECF No. 47-16).

22. At the time of the Architectural Review Committee's recommendation, the "no-fill" ordinance applicable to the property stated: "Multi-family areas are hereby designated as 'no fill' areas where only pilings and stem walls shall be used for all construction except for the minimum amount of fill necessary within the building footprint and other facilities as required by federal, state or local statute, ordinance, law, rule, or regulation."  Ex. 2 at 83 (citing Charlotte County Ordinance No. 2005-067) (ECF No. 46-4).

23. Mr. LeFave's preliminary approval from Charlotte County was specifically conditioned on his demonstrating compliance with the "no-fill" ordinance, among other conditions.

24. The current version of the "no-fill" ordinance provides: "No-fill area. The entire overlay district is designated as a no-fill area, within which only pilings and stemwalls may be used for all construction, except the minimum amount of fill necessary within the building footprint and for drainfields associated with on-site waste treatment and disposal systems." Ex. 76, Ex. A at 16 (ECF No. 49-16) (quoting Charlotte Cty., Fla., Code of Ordinances § 3-9-50(j)(2)).

25. In 2008, Mr. LeFave met with a local businessman, Mr. Domink Goertz, to seek investment capital for the former's planned condominium development.

26. After reviewing Mr. LeFave's development plan and receiving appraisals of the property, Mr. Goertz advised I.H.T. Corporation ("IHT"), a Florida real estate company, to invest.

27. In 2008, IHT loaned $750,000 to Mr. LeFave, secured by a mortgage on the property.

28. In a November 9, 2009, letter, Mr. LeFave's consultant, ESA, warned Mr. LeFave of significant objections from local residents that might push the project into a heightened public concern category.  The ESA letter explained that once a project falls into the heightened public concern category, state permitting authority shifts from the Water Management District to the Trustees, meaning the Governor of Florida's approval is required.

29. Mr. LeFave defaulted on the loan and, in June 2010, a Florida state court granted summary judgment to IHT on its foreclosure petition.

30. The Florida state court found that the total amount due and owing on the LeFave-IHT note was $875,878.02 and held that if the total sum with interest and all costs of IHT's foreclosure action were not forthwith paid, the Clerk of Court should sell the property at a public sale in accordance with Florida law.

31. On September 3, 2010, an advertised public foreclosure sale was conducted. Two entities bid on the property at the public sale: IHT and "nahla zarour."  IHT made the highest bid and purchased the property for $15,200.

32. In September 2011, Mr. Goertz obtained a feasibility report from DMK regarding development of the property.

33. In that feasibility report, DMK advises that any site development would need to comply with the Manasota and Sandpiper Key Zoning District Overlay and the Water Management District's requirements for an Environmental Resource Permit.  The report further states that any structures proposed in sovereign lands would need authorization from the state.

34. The feasibility report also explains that most of the site contains Category I wetlands, which are those wetlands considered critically necessary to sustain the health of Charlotte County's environment.  The feasibility report further states that any development would need to comply with Charlotte County's newest Comprehensive Plan.

35. Approved by the Charlotte County Board of County Commissioners on July 20, 2010, the Comprehensive Plan was designed to avoid, minimize, or mitigate impacts to local wetlands by restoration, enhancement, creation or local wetland mitigation banking, when available.

36. In 2011, IHT, TSCK Investments, LLC, and Real Investment, LLC, created Lemon Bay Cove, LLC, a limited liability company, to try to develop the property.  Mr. Goertz owns Real Investment, LLC.  Mr. Goertz is a managing member and an authorized agent of Lemon Bay through Real Investment.

37. IHT transferred title to the property to Lemon Bay in November 2011 for $10.

38. In 2011, Lemon Bay hired DMK, to assist in attempting to obtain development permits for the property. DMK entered a subcontract with ESA to assist with ecological aspects of permitting.

39. Lemon Bay initially proposed to develop the property by filling 1.95 acres of the 5.64-acre property to construct a twelve-unit single family residence development.  The footprint of Lemon Bay's development was later revised to 2.08 acres.

40. Before applying for any required permits, Lemon Bay's full development plan included a docking facility on the property's southern edge in state sovereign lands that are part of the Lemon Bay Aquatic Preserve.

41. In a pre-application meeting between Lemon Bay and the Water Management District, the Water Management District advised Lemon Bay not to include any docking facilities in state sovereign lands in the permit application for its planned residential development because these docks could push the development into the heightened public concern category.

42. In February and April 2012, Lemon Bay applied to the Water Management District and the Corps for required permits. Lemon Bay did not propose docks in its permit application to the Water Management District or in its original permit application to the Corps.

43. In December 2012, Lemon Bay received an Environmental Resource Permit from the Water Management District. The permit approved a twelve-unit project without a docking facility. The permit for this project expired on January 5, 2018.

44. The Corps issued a public notice regarding the project and received over 200 letters in opposition.

45. The federal Environmental Protection Agency ("EPA") and National Marine Fisheries Service ("Fisheries Service") expressed concerns regarding the project's impact on mangrove wetlands, marine habitats, and local fish and wildlife.

46. The EPA designated the mangrove wetlands on the property to be aquatic resources of national importance and stated that the Lemon Bay project did not comply with the guidelines established under Section 404(b)(1) of the Clean Water Act.

47. The Corps determined that Lemon Bay's project was not water dependent because the project's basic project purpose was to construct houses and did not require access to a special aquatic site. The Corps informed Lemon Bay that, because the project was not

water dependent, the Corps was required to assume that less environmentally damaging practicable alternatives existed for Lemon Bay's development.

48. In response to the Corps' concern that the project was not the least environmentally damaging practicable alternative, Lemon Bay submitted a document titled "Practical Alternatives Narrative" in December 2012. This document analyzed three proposed alternative sites for the project in the Charlotte County area. Of the three sites identified in the narrative, two were not for sale and the third would have cost $1.25 million to purchase. In the narrative, Lemon Bay represented that, as the property was acquired due to foreclosure, development of this specific land was the only way for the former lender—and now current owner—to avoid incurring a total loss on its investment.

49. In February 2013, Lemon Bay amended the project application to the Corps to include a thirteen-slip dock to assert that the project was water dependent.

50. The thirteen-slip dock that Lemon Bay included in its amended development proposal would be constructed outside the legal description of the lands the Trustees sold to Mr. Farr in 1954. Thus, to construct the proposed dock on sovereign lands, Lemon Bay would have to acquire permission (*e.g.,* a lease) to encroach on state sovereign lands.

51. The project amendment necessitated a new public notice period.

52. The Corps informed Lemon Bay that the project amendment raised concerns about conflicts with the Endangered Species Act and the Marine Mammal Protection Act due to the project's potential impacts to the West Indian manatee.

53. In 2012, Lemon Bay responded to the concerns raised with the proposed dock by reducing the slips on the proposed dock from thirteen to nine.

9

54. Like the thirteen-slip dock, the modified nine-slip dock was proposed in state sovereign lands, outside the legal bounds of Lemon Bay's property, and would have required a lease from the State of Florida to encroach on sovereign lands.

55. As a part of the Corps' interagency consultation for section 404 permit applications, the United States Fish and Wildlife Service issued a Biological Opinion in 2013 pursuant to the Endangered Species Act on Lemon Bay's amended project (i.e., a twelve-unit residential development with a dock).  The Biological Opinion stated that the property had no upland shoreline which would allow for the construction of docks, and that creation of shoreline to allow for dock construction is inconsistent with manatee protection efforts.

56. The Biological Opinion stated that, if Lemon Bay removed the docks from the proposed development, there would be no concerns related to the West Indian Manatee.  Lemon Bay declined to remove the docks from the proposed development.

57. In January 2014, the Corps reiterated its concern that Lemon Bay had not provided enough information to demonstrate that the proposed project was the least environmentally damaging practicable alternative as required by the Clean Water Act. Among other issues, the Corp requested that Lemon Bay demonstrate why a smaller development or off-site alternatives were not practicable. Ex. 68 (ECF No. 49-8).

58. In May 2014, Lemon Bay responded to the concerns, repeating its statement that developing the property was the only way for Lemon Bay's investors to minimize financial damage associated with the prior owner's default.  Lemon Bay also stated that the twelve-unit single-family development was the minimum necessary for an economically viable project.  Ex. 70 (ECF No. 49-10).

59. In January 2015, the Corps again explained its concerns (1) that Lemon Bay had not shown the revised project to be the least environmentally damaging practicable alternative, (2) that Lemon Bay failed to provide an adequate alternative analysis, and (3) that the dock component of the project was likely to result in a "take" of the West Indian Manatee.  The Corps noted that it would be unlikely to permit the project as proposed and invited Lemon Bay to address ongoing issues.  Ex. 71 (ECF No. 49-11).

60. In response, Lemon Bay voiced its disagreement with the Fish and Wildlife Service's conclusions about the docks and submitted a report from Market America Realty that Lemon Bay previously submitted to the Water Management District.  Attached to the Market America report was an "investment exit plan calculation," which presented Lemon Bay's assertion that a twelve-unit development was the only financially feasible way to recoup the costs of development, including the loan made to the prior owner.  Ex. 72 at 6 (ECF No. 49-12).

61. The Corps denied Lemon Bay's permit application with prejudice on February 1, 2016, finding that it did not comply with the section 404(b)(1) guidelines and was contrary to the public interest.  The Corps also emphasized the proposed project's risk to the West Indian Manatee.

62. Lemon Bay administratively appealed the decision on March 29, 2016.  The Corps found that the appeal had no merit on December 19, 2016.

63. Lemon Bay never applied for any development permits from Charlotte County, nor did it apply for a lease or other authorization from the State of Florida to construct a dock in state sovereign lands that are designated an Aquatic Preserve.

III.    ISSUES OF FACT AND LAW

1.  Whether the Corp's denial, based on Clean Water Act regulations that have existed since
    the 1970's, of a section 404 permit application to develop single family residences on
    mangrove wetlands and submerged lands that were purchased twice between 1993 and
    2010 for less than $16,000 effected the regulatory taking of a multi-million dollar
    property interest?

    a.  Does a loan that Plaintiff's predecessor-in-interest extended to a prior owner of
        the property and that was foreclosed on two years prior to the submission of
        Plaintiff's permit application to the Corps evince *Plaintiff's* reasonable
        investment-backed expectation that the property could be filled for a residential
        development?

    b.  Does the longstanding governmental interest in preventing harm to Florida's
        shoreline, water quality, and endangered species have the character of a taking of
        submerged lands and wetlands?

    c.  Can Plaintiff establish that the Corps' permit denial had a negative economic
        impact where Plaintiff's proposed residential development with a dock on state
        sovereign lands would require a change in use that is contrary to state and local
        regulation and contingent on not-yet-applied-for permits from those governmental
        entities?

2.  Whether the Corps' denial of a section 404 permit application to develop single family
    residences on mangrove wetlands and submerged lands constitutes the "relatively rare
    situation" and "extraordinary circumstance" where regulation deprives a landowner of *all*
    economically beneficial use of land?

a. Is the property's eligibility to participate in Charlotte County's conservation program, whereby marketable transfer of density units are allocated in exchange for a conservation easement, irrelevant to the economic value of the property?

b. Does the Corps' denial of a multi-unit residential development that was not water dependent constitute an absolute bar of any development of the property?

3. Does Plaintiff possess an absolute right to bulkhead and fill the wetlands and submerged lands under Florida law and can Plaintiff segregate that alleged right to assert a takings claim of that singular "stick" in the bundle of its real property rights?

IV.   DISCUSSION

The Fifth Amendment to the Constitution provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. "The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 416 (1922). The Supreme Court has "generally eschewed any set formula for determining how far is too far, choosing instead to engage in essentially ad hoc, factual inquiries." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 326 (2002) (internal quotation marks omitted) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992) (quoting *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978))). That said, the Supreme Court created a categorical rule in regulatory takings cases for those "relatively rare situations where the government has deprived a landowner of *all* economically beneficial uses." *Lucas*, 505 U.S. at 1018 (emphasis added).

"[T]he burden of proof rests on plaintiffs, and not on the defendant, to establish that a taking has occurred justifying the payment of just compensation." *Loesch v. United States*, 645

13

F.2d 905, 914 (Ct. Cl. 1981) (per curiam) (citations omitted).  For the reasons stated below,

Plaintiff cannot establish either a *Penn Central* or a *Lucas* taking of the property.

> A.   The Corps' denial of Plaintiff's section 404 permit application for a residential development on submerged lands and wetlands does not constitute a regulatory taking under *Penn Central*.

An ad-hoc inquiry of the facts of this case reveals that the Corps' permit denial does not

constitute a taking.  Lemon Bay itself acquired the property for $10 in November 2011.  The

only potentially relevant investment Lemon Bay made into the residential development of the

property is its predecessor-in-interest's $15,200 purchase of the site in 2010.  Even that meager

investment in the context of the long-standing federal, state, and local regulation of development

of wetlands and submerged lands debunks Plaintiff's insistence that it held *reasonable*

investment-backed expectations in the residential development of the property.  Similarly, the

weighty and well-established environmental and ecological interests that courts have long

associated with the Clean Water Act – such as preventing harms from the unrestricted

development of environmentally sensitive areas – establish that the character of the government

action does not support a taking.  Finally, Plaintiff can only conjure a deleterious economic

impact from the Corps' denial by contrasting a hypothetical residential development that Plaintiff

never sought approval to build with a *de minimis* valuation that ignores the economic value of

transfer of density units the property is eligible to earn.

Where, as here, a taking by government regulation is alleged, "a court must typically

conduct a complex factual assessment to determine whether compensation is owed to the

property holder." *Bass Enters. Prod. Co. v. United States*, 381 F.3d 1360, 1365 (Fed. Cir. 2004).

"Anything less than a 'complete elimination of value,' or 'a total loss,' . . . would require the

kind of analysis applied in *Penn Central*." *Tahoe-Sierra*, 535 U.S. at 330 (citing *Lucas*, 505 U.S.

at 1019-20 & n.8).  "Under *Penn Central*, courts use a three-factor analysis to assess claimed

14

regulatory takings: (1) character of the governmental action, (2) economic impact of the regulation on the claimant, and (3) extent to which the regulation interfered with distinct investment-backed expectations." *Cienega Gardens v. United States*, 331 F.3d 1319, 1337 (Fed. Cir. 2003).  For the reasons that immediately follow, not one of these three factors supports the taking Plaintiff asserts.

1. Plaintiff cannot proffer evidence of reasonable investment-backed
   expectations based on its predecessor-in-interest's loan to yet another
   predecessor-in-interest.

Plaintiff lacks evidence of reasonable investment-backed expectations.  The state and federal regulatory programs that stand between Plaintiff's residential development and the loss of valuable submerged lands and wetlands have existed for decades prior to Plaintiff's acquisition of the property.  Although this fact alone does not defeat Plaintiff's takings claims, it weighs heavily against it.  Further tipping toward an absence of reasonable investment-backed expectations is the meager $15,200 paid for the property in 2010.  It is this amount—not a private loan that Plaintiff's predecessor-in-interest made to an earlier owner of the property—that is the subject of an investment-backed expectations analysis under *Penn Central*.  The notion that a $15,200 purchase evinced a reasonable investment-backed expectation to a nearly $3.9 million residential development is amiss.

"'[I]t is particularly difficult to establish a reasonable investment-backed expectation' if the property was acquired after the alleged regulatory restriction." *Anaheim Gardens*, *LP v. United States*, 953 F.3d 1344, 1350 (Fed. Cir. 2020) (quoting *Norman v. United States*, 429 F.3d 1081, 1092-93 (Fed. Cir. 2005)).  "[W]hile '[a] valid takings claim will not evaporate just because a purchaser took title after the law was enacted, the timing of the purchase and knowledge of the purchaser are relevant considerations in determining whether a purchaser had reasonable investment-backed expectations with which the government's regulatory action

interfered." *Id.* (second alteration in original) (quoting *Murr v. Wisconsin*, 137 S. Ct. 1933, 1945 (2017)).  "[T]he complete absence of reasonable distinct investment-backed expectations can weigh sufficiently heavily to be dispositive of a takings claim." *Id.* at 1351 (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984)).

Trial will show that the relevant and long-standing regulatory background undercuts Plaintiff's insistence that it possessed reasonable investment-backed expectations to develop single family residences on the wetlands and submerged lands of the property.  The relevant regulatory background is summarized in three separate permitting programs.  First, the Clean Water Act that was enacted in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  In April 1974, the Corps "institute[d] a full-fledged wetlands policy to protect wetlands subject to [federal] jurisdiction from unnecessary destruction."  *Deltona Corp. v. United States*, 657 F.2d 1184, 1188 (Ct. Cl. 1981); *see* Permits for Activities in Navigable Waters or Ocean Waters, 39 Fed. Reg. 12,115-01 (Apr. 3, 1974).  Second, the State of Florida has regulated wetlands since the 1970's under its Environmental Resource Permit program.  Fla. Stat. Ann. § 373.4131 (West 2020).  An ERP applicant must: "(1) demonsrat[e] that [a regulated]  activity . . . will not be harmful to [] water resources or will not be inconsistent with the overall objectives of the district," (2) "provide reasonable assurance that state water quality standards . . . will not be violated[,]" and (3) provide "reasonable assurance that such activity in, on, or over surface waters or wetlands . . . is not contrary to the public interest."  Fla. Stat. Ann. § 373.414(1) (West 2020).  And third, Plaintiff's residential development must comply with Charlotte County's Comprehensive Plan and Land Development Regulations.  Charlotte Cty., Fla. Code of Ordinances art. 1, § 3-9-7. The current Comprehensive Plan seeks to "avoid, minimize, or mitigate impacts to wetlands,"

and restricts allowable wetlands impacts to a select list of activities.  Ex. 1 at ENV Goal 3 (ECF

No. 46-3).  Wetland parcels created prior to June 2010 may only be developed "if adequate

uplands do not exist to support the footprint of the proposed use [and] impacts shall be limited to

the minimal area necessary to support the proposed use."  *Id*. at ENV Policy 3.1.5.  And

development of the Category I wetlands on Plaintiff's property is restricted "to cases where no

other feasible and practicable alternative exists that will permit a reasonable use of the land,"

"regardless of any other regulatory agency authorization." *Id.* at ENV Policy 3.1.3.  It is for these

reasons that Mr. LeFave's own consultant advised that development of his residential

development would be very difficult and IHT's own consultant advised that its residential

development would be very challenging.

Compounding these regulatory hurdles is the meager investment Plaintiff made in the

property.  Lemon Bay acquired the property for the token consideration of ten dollars.  Lemon

Bay's predecessor-in-interest, IHT, acquired the property at a foreclosure sale for $15,200 in

2010.  And IHT's predecessor-in-interest, Mr. LeFave, acquired the property at tax sale for

$12,100 in 1993.  That tax sale was held because the previous owner developed the neighboring

land that was filled prior to the advent of the permitting regimes above and then stopped paying

taxes on the subject property, which consists of mostly highly-regulated wetlands and submerged

lands.  These sales transactions, taken in the context of this regulatory background, are

incompatible with a reasonable expectation that waters of the United States could be filled to

accommodate a residential development.  Rather, they reflect that market participants believed

that residential development was *not* possible.

Plaintiff's repeated invocation of a private $750,000 loan made to Mr. LeFave as

evidence of a reasonable investment-backed expectation, Pl.'s Mem. of Contentions of Fact &

Law 18, 21, ECF No. 72 ("Pl.'s Br."), is unavailing.  First, it was IHT, not Lemon Bay, that extended the loan to Mr. LeFave.  Second, a loan is a personal financial promise, not an investment in property.  *Martyn v. First Fed. Sav. & Loan Ass'n of W. Palm Beach*, 257 So.2d 576, 578 (Fla. Dist. Ct. App. 1971) (holding "[t]he mortgage lien is itself a species of intangible property" and "a chose in action which creates a lien on the land but not an interest in the land" (internal citations omitted)).  To be sure, a loan can be—and in this case was—secured by real property.  Fla. Stat. Ann. § 697.01(1) (West 2020).  But the mortgagee's expectation is defined by the structured payments of principal and interest that the mortgagor will make over the life of the loan, not the profitability of the real estate that secures the promissory note.  Hence, Florida law permits a mortgagee to pursue payment of principal personally against a mortgagor when there is a deficiency following a foreclosure sale.  *See, e.g.,* Fla. Stat. Ann. § 702.06 (West 2020).  IHT's expectation that Mr. LeFave would repay the mortgage was frustrated.  But that frustration is not tethered to the Corps' permit denial because the foreclosure judgment preceded the submission of a section 404 permit application by nearly two years.  Plaintiff cannot convert IHT's hoped-for installment payments from Mr. LeFave into Lemon Bay's investment-backed expectation *in the property*.  IHT's investment in the property was its $15,200 purchase at foreclosure.  Lemon Bay's investment in the property was its $10 consideration for a title transfer.

Plaintiff improperly invokes *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001), *cited in* Pl.'s Br. 20-21, to argue that the regulatory timeline of the Clean Water Act, state regulation, and local regulation is irrelevant to *Penn Central's* examination of reasonable investment-backed expectations.  *Palazzolo* held that "[a] blanket rule that purchasers with notice have no compensation right when a claim becomes ripe is too blunt an instrument to accord with the duty

to compensate for what is taken." 533 U.S. at 628. Yet "[*Palazzolo's*] holding does not mean

that the timing of the regulation's enactment relative to the acquisition of title is immaterial to

the *Penn Central* analysis." *Id.* at 633 (O'Connor, J. concurring), *quoted in Tahoe-Sierra*, 535

U.S. at 336. Similarly, the Federal Circuit holds that a "property owner who buys land with

knowledge of a regulatory restraint 'could be said to have no reliance interest, or to have

assumed the risk of any economic loss.'" *Mehaffy v. United States*, 499 F. App'x 18, 22 (Fed

Cir. 2012) (quoting *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1177 (Fed. Cir.

1994)). Plaintiff constructs a strawman that a pre-existing regulatory backdrop alone is

dispositive, when the United States' position is that the regulatory backdrop at the time Plaintiff

and IHT purchased the property informs the reasonableness of any investment-backed

expectation. *Cf. Good v. United States*, 39 Fed. Cl. 81, 114 (1997) (holding that a section 404

permit denial to fill wetlands and submerged lands in Florida for residential development did not

constitute an inverse taking because "[p]laintiff recognized contemporaneously with his two

major investments in the property that its ecological sensitivity would make it difficult to secure

development approvals from federal, state and county officials" and "[l]and development at both

points in time was a highly regulated business, and plaintiff's sought uses . . . were subject to

restriction or prohibition under that regulatory regime"), *aff'd*, 189 F.3d 1355 (Fed. Cir. 1999)..

In sum, Plaintiff cannot convert its predecessor-in-interest's failed loan to Mr. LeFave

into its own investment into the subject property. Plaintiff paid only $10 to acquire title to the

property. And even if Plaintiff can attribute to itself IHT's $15,200 purchase price, this amount,

coupled with (1) long-standing regulatory restrictions on filling submerged lands and wetlands

and (2) contemporary advice from Plaintiff's own consultants that development was unlikely,

renders Plaintiff's claimed expectation for a nearly $3.9 million residential development unreasonable.

2.    The government's interest in protecting valuable wetlands and submerged lands measured against Plaintiff's interest in an ever-changing proposal for residential development militates against a finding of a regulatory taking.

Because the Corps' section 404 program has existed for nearly a half century, courts have had multiple opportunities to weigh in on its importance.  Courts have consistently found that the program furthers important public interests by preventing harm to a valuable environmental and social resource.  Juxtaposed to these important public interests here is a shifting residential development plan that was not water dependent.  At bottom, Plaintiff has no meaningful injury to tip *Penn Central's* character of the government action prong in Plaintiff's favor.

In evaluating *Penn Central's* character of the government action prong, courts must "consider the purpose and importance of the public interest underlying a regulatory imposition." *Brace v. United States*, 72 Fed. Cl. 337, 355 (2006) (quoting *Maritrans, Inc. v. United States*, 342 F.3d 1344, 1356 (Fed. Cir. 2003)), *aff'd*, 250 F. App'x 359 (Fed. Cir. 2007) (per curiam). Thus, courts must "inquire 'into the degree of harm created by the claimant's prohibited activity, its social value and location, and the ease with which any harm stemming from it could be prevented.'" *Id.* (internal quotation omitted).  Ultimately, a court must assess if the challenged action "amounts to a physical invasion or instead merely affects property interests through some public program adjusting the benefits and burdens of economic life to promote the common good." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005) (internal quotation marks and citation omitted).

Here, the Corps' section 404 permitting regime "is designed to protect and preserve the nation's wetlands." *Mehaffy v. United States*, 102 Fed. Cl. 755, 768 (2012), *aff'd*, 499 F. App'x

18 (Fed. Cir. 2012).  "[T]he United States has a legitimate public welfare obligation to preserve

our nation's wetlands."  *Brace*, 72 Fed. Cl. at 356 (internal quotation omitted).  *See Forest*

*Props., Inc. v. United* States, 39 Fed. Cl. 56, 76 (1997) ("This nation clearly has a legitimate

public welfare duty to preserve the nation's wetlands . . . ."), *aff'd,* 177 F.3d 1360 (Fed. Cir.

1999); *Fla. Rock Indus., Inc. v. United States*, 791 F.2d 893, 904 (Fed. Cir. 1986) (en banc)

(holding that "the preservation of wetlands bears a substantial relationship to the public welfare

as perceived by the best lights of our time").  These wetlands "filter and purify water draining

into adjacent bodies of water, . . . slow the flow of surface runoff into lakes, rivers, and streams

and thus prevent flooding and erosion, . . . [and] serve significant natural biological functions,

including food chain production, general habitat, and nesting, spawning, rearing and resting sites

for aquatic . . . species."  *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 134-35

(1985) (last ellipses in original) (internal quotation marks and citations omitted).  Thus, the

existence of the section 404 regulatory program "indisputably serve[s] an important public

purpose—one which benefits plaintiff as members of the public at large."  *Brace*, 72 Fed. Cl. at

356 (citations omitted).  And "the [Clean Water Act] and the wetlands regulations issued

thereunder are generally applicable to all similarly situated property owners and can in no way

be viewed as being directed at plaintiff[]."  *Id.* (citing *Am. Pelagic Fishing Co. v. United States*,

49 Fed. Cl. 36, 50-51 (2001)).

Contrasting these well-established and important government interests with Plaintiff's

ever-changing development plans shows that *Penn Central's* character of the government action

factor tips in the United States' favor.  At bottom, Plaintiff seeks to build a residential

development.  But the "social value," *id.* at 355, of a residential development can be met without

filling wetlands and submerged lands.  Moreover, Plaintiff's initial application to the Corps (and

the project the Water Management District approved) did not feature any docks or other water-related fixtures.  When the Corps pointed out this lack of water dependency, Plaintiff added different plans for a boat dock to shoehorn the project into one that is water related.  But the fact that Plaintiff's Water Management District-approved project and the original project submission had no relation to the water belies the supposition that Plaintiff has suffered a meaningful "degree of harm," *id.*, from the Corps' permit denial.  Residential development can occur on uplands, rather than ecologically-sensitive wetlands and submerged lands.  And Plaintiff's ability to retrieve value from the property by way of transfer of development units, *infra* Part IV.A.3, that can be used to pursue residential development on lands that are not submerged or wetlands, tips the character of the government action factor in favor of the United States.

Plaintiff's exclusive reliance on *Resource Investments, Inc. v. United States*, 85 Fed. Cl. 447, 517 (2009), *cited in* Pl.'s Br. 15, for the character prong of *Penn Central* does not command a different result.  First, the supposition that "the mere purpose" of the section 404 program "immunize[s] the government's actions under this prong of *Penn* Central," Pl.'s Br. 15 (emphasis omitted) (quoting *Res. Invs.*, 85 Fed. Cl. at 517), is a strawman that misstates the United States' argument in this case (as is evident in the two preceding paragraphs).  Second, even if *Resource Investments* purported to abrogate the binding Federal Circuit precedent the United States relies on for the character of the government action prong (which a Court of Federal Claims' decision cannot do), the Court of Federal Claims lacked subject-matter jurisdiction in *Resource Investments.  Res. Invs., Inc. v. United States,* 114 Fed. Cl. 639, 655 (2014).  "[W]hen a suit is dismissed for lack of jurisdiction, rulings on the merits rendered prior to the dismissal are nullities, void *ab initio*." *Hydaburg Co-op Ass'n v. United States*, 667 F.2d 64, 66 (Ct. Cl. 1981).

In sum, the character of the government's action under the Clean Water Act is to protect and prevent damage to wetlands and the waters of the United States.  Government efforts to prevent public harms caused by unfettered private rent seeking do not have the character of a taking and, therefore, the character of the government action here weighs against finding a taking.

3.   <u>The economic impact of the Corps' section 404 permit denial is not sufficient to constitute a regulatory taking</u>.

The property's ecological characteristics as wetlands and submerged lands qualify it for valuable transfer of density units under Charlotte County's conservation program.  This value does not hinge on the issuance of a section 404 permit and negates the supposition that the Corps' permit denial adversely impacted Plaintiff economically.  Plaintiff's proffer of economic impact is based on an erroneous before value that assumes (1) a new use of the property despite state and local regulatory hurdles and (2) an after valuation that ignores the property's value through the conservation program.  Trial will show that the economic impact prong of *Penn Central* weighs against finding a taking.

The economic impact of regulation is "measured by the change, if any, in the fair market value caused by the regulatory imposition."  *Fla. Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1567 (Fed. Cir. 1994) (citations omitted).  "Intrinsically linked to the determination of fair market value is a determination of the highest and best use."  *Lovelladies Harbor, Inc. v. United States*, 21 Cl. Ct. 153, 156 (1990), *aff'd,* 28 F.3d 1171 (Fed. Cir. 1994).  The term "highest and best use" means "[t]he reasonably probable and legal use of [property], which is physically possible, appropriately supported, financially feasible, and that results in the highest value."  *Arctic King Fisheries, Inc. v. United States*, 59 Fed. Cl. 360, 375 (2004) (alterations in original) (internal quotation omitted).  "Ordinarily, the highest and best use for property condemned is the

use to which it is subject at the time of the taking." *Fordyce v. United States*, 7 Ct. Cl. 591, 599-600 (1985). That said, fair market value in takings cases "may reflect not only the use to which the property is presently devoted but also that use to which it may be *readily* converted." *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 275 (1943) (emphasis added).

To start, the property sold in its as-is condition in 1993 and 2010 for $12,100 and $15,200, respectively. The United States will proffer testimony that the property's participation in Charlotte County's conservation program would not require a physical alteration, is legally permissible, and maximally productive. This use, therefore, is readily available. And trial will show that once a conservation easement is submitted in compliance with the County's program, the property would yield forty-two transfer of density units with an aggregated value of over $500,000. Since the Corps' denial of the section 404 permit does not affect the property's eligibility to participate in the County conservation program, the denial has no economic impact on the property.

Plaintiff's proffer of economic harm is based on a hypothetical residential development in the "before" scenario that features at least three fatal flaws. First, Plaintiff's appraisal opinion is based on a seven-unit single-family residential subdivision featuring a seven-slip boat dock; not the twelve-unit development with a nine-slip dock that was the subject of the Corps' permit denial, nor the development without a dock that the Water Management District approved. Plaintiff's appraiser cannot show that either Charlotte County or the Water Management District would approve this newly minted development plan.[1] In fact, the new development plan

---

[1] Plaintiff mistakenly relies on *Ciampetti v. United States*, 18 Cl. Ct. 548, 555 (1989), *cited in* Pl.'s Br. 38, for the notion that the regulatory requirements of the Water Management District and Charlotte County are irrelevant. But the cited portion of *Ciampetti* speaks to whether a takings claim is ripe when unresolved state regulatory requirements exist after a section 404

contradicts Charlotte County's restriction that seeks to "[a]void, minimize, or mitigate impacts to wetlands," Ex. 1 at ENV Goal 3 (ECF No. 46-3), and restricts development of Category I wetlands "to cases where no other feasible and practicable alternative exists that will permit a reasonable use of the land." *Id.* at ENV Policy 3.1.3.  And trial will show that the new development plan would feature a boating dock on sovereign lands Lemon Bay did not hold title to, which would likely trigger heightened review from the Water Management District and necessitate approval by the Governor and Cabinet.  These barriers frustrate the notion that Plaintiff's proposed new and different use of the property is "readily" convertible.

Second, Plaintiff's "before" valuation opinion is based on an income approach, not a comparable sales approach.  "The income capitalization approach is relevant only in certain circumstances—namely, in the valuation of income-producing property with no available comparable sales."  Interagency Land Acquisition Conference, Uniform Appraisal Standards for Federal Land Acquisitions 136-37 (6th ed. 2016) (citing, *inter alia*, *United States v. 25.202 Acres of Land*, 860 F. Supp. 2d 165, 176-77 (N.D.N.Y. 2010)).  *See also United States v. 69.1 Acres of Land*, 942 F.2d 290, 293-94 (4th Cir. 1991) ("[Income capitalization] valuations almost always achieve a chimerical magnitude, because in the mythical business world of income capitalization, nothing ever goes wrong.") (footnote omitted).  Trial will show that courts' skepticism of the

---

permit denial.  18 Cl. Ct. at 553-55 ("Plaintiffs' claim cannot, therefore, be dismissed on ripeness grounds.").  Here, the United States does not assert that Lemon Bay's claims are unripe.  Instead, the United States points out that the Corps' section 404 permit denial is not a but for cause of Plaintiff's inability to change the use of the property to one of the different residential development plans Plaintiff has presented.  "It is well established that a takings plaintiff bears the burden of proof to establish that the government action caused the injury."  *St. Bernard Parish Gov't v. United States*, 887 F.3d 1354, 1362 (Fed. Cir. 2018), *cert. denied,* 139 S. Ct. 796 (2019).

income capitalization approach finds footing in Plaintiff's before valuation.  Plaintiff's flawed "before" valuation invalidates its claim of economic impact under *Penn Central*.

Third, Plaintiff's proffer of economic harm is based on a nominal value in the "after" scenario.  This after value ignores the property's eligibility in Charlotte County's conservation program.  This oversight invalidates Plaintiff's highest and best use determination in the "after" valuation.

The United States will proffer a competent showing of economic value that shows Plaintiff enjoying a substantial return on a $15,200 purchase price.  By contrast, Plaintiff's economic impact proffer is based on a use in the before scenario that disregards existing state and local regulation and a use in the after scenario that disregards the value of transfer of density units.  Plaintiff's proffer is unsound and *Penn Central's* economic impact prong favors the United States.

      B.    <u>The Corps' denial of Plaintiff's section 404 permit for a residential development on submerged lands and wetlands did not deprive the property of all economic beneficial use.</u>

Plaintiff's insistence that the Corps' permit denial triggers a categorical taking of Plaintiff's property is wrong.  The United States will show at trial that the characteristics of the property qualify it as a candidate for transfer of density units.  These units negate the supposition that the property has no economic use due to the Corps' permit denial.  Furthermore, trial will show that Plaintiff's calculation of total loss of property value is based on a counter-factual assumption that the Corps' permit denial is the "but for" cause of Plaintiff's not constructing its proposed residential development.  In fact, no state or local government has considered or approved the development plan the Corps denied and Plaintiff cannot proceed with construction in the absence of those state and local authorizations.

*Lucas'* categorical rule is reserved for "the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted. . . ." 505 U.S. at 1017 (emphasis in original). "The emphasis on the word 'no' in the text of [*Lucas*] was, in effect, reiterated in a footnote explaining that the categorical rule would not apply if the diminution in value were 95% instead of 100%." *Tahoe-Sierra*, 535 U.S. at 330 (citing *Lucas*, 505 U.S. at 1019 n.8). An economic use is something that "enable[s] a landowner to derive benefits from land ownership . . . ." *Lost Tree Vill. Corp. v. United States*, 787 F.3d 1111, 1117 (Fed. Cir. 2015). Hence, transfer of density rights "undoubtedly mitigate whatever financial burdens the law has imposed on [landowners] and, for that reason, are to be taken into account in considering the impact of regulation." *Penn Cent.*, 438 U.S. at 137.

Plaintiff cannot show a total loss of value because Plaintiff possesses a valuable interest in transfer of density units even in the absence of a section 404 Corps permit. Charlotte County initiated a transfer of density program in 1994 and enacted the transfer of density unit program currently in place in 2004 as an economic incentive for the preservation of environmentally sensitive lands and low-density areas. Pursuant to this County program, a landowner records a conservation easement or other covenant restricting development and applies for the removal of density from the property. A developer can then purchase the transfer of density units following County certification. At trial, the United States will present evidence that the property is eligible for participation in the County's transfer of density unit program and that this eligibility results in a $570,000 valuation even without a Corps permit. Obviously, a property worth $570,000 is not economically idle.

Notwithstanding this evidence of value, Plaintiff argues that *Lucas* applies for four reasons. Trial will show that these arguments lack merit.

First, Plaintiff's effort to undermine the transfer of density units' contribution to the value of the property as a legal matter is unavailing.  Plaintiff insists that *Penn Central's* discussion of development rights being a relevant consideration in addressing the economic impact of regulation is dictum and cites to a concurring opinion in *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 749 (1997) (Scalia, J., concurring), that "[i]f *Penn Central's* one-paragraph expedition into the realm of [transfer of density rights] were not distinguishable [on the basis that it only applies to contiguous parcels owned by the same entity], it would deserve to be overruled."  Pl.'s Br. 29-30.  On the first point, Plaintiff is wrong.  Both the plain language of *Penn Central* and the cases interpreting this language confirm that the transfer of density units available under the Charlotte County program are relevant to economic value.  *Penn Cent.*, 438 U.S. at 137.  *See Good*, 39 Fed. Cl. at 107-08.  On the second point, Justice Scalia's decades-old, non-precedential view that *Penn Central's* holding as to the relevance of transfer of density rights should be overruled is immaterial to a trial court that must follow precedent.  *See id.* at 108 ("While the concurring justices in *Suitum* clearly indicate opposition to this proposition, their opinion underscores the Court's reaffirmance of the *Penn Central* holding that the values of [transfer of density rights] is to be considered to answer the threshold question of whether a taking has occurred.").

Second, Plaintiff's effort to undermine the transfer of density units' contribution to the value of the property as a factual matter is unavailing.  Plaintiff assures the Court that even if the Court permits the United States' witnesses to testify as to the value of transfer of density units, those units will have value separate and independent from the property.  Pl.'s Br. 30-31. Plaintiff's argument overlooks the basis for the transfer of density units: the property and the characteristics of the property that qualify it for transfer of density units.

28

Third, Plaintiff's calculation of economic loss is incorrect for the reasons already discussed in the economic impact prong of *Penn Central*. *Supra* Part IV.A.3.

Fourth, Plaintiff's insistence that "[t]he effect of the Corps' permit denial is to preclude any development of the Property," Pl.'s Br. 14, is incorrect. A contrast between the type of regulation at issue in *Lucas* and a standard 404 permit denial illustrates why Plaintiff has not experienced a total loss of economic value. *Lucas* involved a regulation that forbade *any* development whatsoever. 505 U.S. at 1006-08. The Corps' permit denial in this case addressed a proposed twelve-unit single family residential development with a nine-slip dock. Feb. 1, 2006 Ltr. From J. Kirk to H. Geortz (ECF No. 41-7). Rather than being based on a categorical refusal to allow development, this permit denial was based on a range of detrimental impacts from the particular project proposed, including the Fish and Wildlife Service's determination that the dock was likely to impermissibly adversely affect the endangered West Indian manatee, and that Lemon Bay failed to demonstrate that its project was the least damaging practicable alternative. Mem. for Rec. (ECF No. 41-6). Plaintiff obfuscates these differences by hypothesizing that the Corps would not allow any development of the property. Pl.'s Br. 10. But Plaintiff will offer no competent evidence at trial for this supposition, nor will it offer evidence that the Corps asserts regulatory jurisdiction over the upland portion of the property.

In sum, Plaintiff is unable to shoehorn this case into the "relatively rare situation" and "extraordinary circumstance" where regulation deprives a landowner of *all* economically beneficial use of land. Even after the Corps' permit denial, the property's characteristics qualify it as a candidate for valuable transfer of density units. And Plaintiff's calculation that the Corps' denial caused a nearly 100% loss in value of the property is premised on an unfounded assumption that Plaintiff's amended application proposal (*i.e.,* a multi-unit residential

development with a boat dock in sovereign lands) is legally permissible.  Plaintiff's *Lucas* claim

lacks merit.

C.      Plaintiff's claim to bulkhead and fill cannot be segregated from the property for
        takings analysis and, in any event, is subject to regulation.

Plaintiff focuses on a Florida state statutory provision that the Florida legislature repealed

in 1957 and asserts that frustration of this supposed absolute and individualized right, alone,

constitutes a taking.  Plaintiff is wrong.  Any ability to bulkhead and fill submerged lands is not

absolute, but subject to reasonable regulation.  And whatever rights Plaintiff has to bulkhead and

fill cannot be segregated from other rights associated with the real property and subjected to

individualized scrutiny under *Penn Central* or *Lucas.*  Instead, Plaintiff's supposed entitlement to

bulkhead and fill is but one stick in the bundle of rights associated with ownership of the subject

property and those rights must be evaluated jointly in a legitimate takings analysis.  For the

reasons already explained in this brief, Plaintiff's claim of a taking of the parcel as a whole fails.

*Supra* Parts IV.A-B.

Plaintiff's claimed right to bulkhead and fill cannot be separated and individually

analyzed under *Penn Central* or *Lucas.*  "'Taking' jurisprudence does not divide a single parcel

into discrete segments and attempt to determine whether rights in a particular segment have been

entirely abrogated."  *Penn Cent.*, 438 U.S. at 130.  *See id.*, *cited in Concrete Pipe and Prods. of*

*Calif., Inc. v. Constr. Laborers' Pension Trust for S. Calif.*, 508 U.S. 602, 644 (1993).  The

Supreme Court has "consistently rejected" the "circular" approach of "defining the property

interest taken in terms of the very regulation being challenged. . . ."  *Tahoe-Sierra*, 535 U.S. at

331.  The focus is rather "on the nature and extent of the interference with rights in the parcel as

a whole . . . ."  *Penn Cent.*, 438 U.S. 130-31.  Plaintiff's response that it *could* separate

submerged lands from uplands and sell the different parcels to different owners, Pl.'s Br. 35

(citing *Caples v. Taliaferro*, 197 So. 861, 862 (Fla 1940)), is irrelevant.  "Where the developer treats legally separate parcels as a single economic unit, together they may constitute the relevant parcel."  *Forest Props. Inc. v. United States*, 177 F.3d 1360, 1365 (Fed. Cir. 1999).  Here, the submerged lands, wetlands, and uplands are not only combined in a single legal description, Plaintiff's varied development plans treat them as a single economic unit.  Plaintiff's attempt to segregate one right from one portion of its property and demand a stand-alone takings analysis of that single right fails.

In addition, Plaintiff's characterization of its right as a "special riparian right" that is not subject to regulation, Pl.'s Br. 33 (citing *Trs. of the Internal Improvement Fund v. Claughton*, 86 So. 2d 775, 789 (Fla. 1956)), is unsound for two reasons.  First, *Claughton*'s reference to a "special riparian right" *narrows* the statutory right to bulkhead and fill by holding that "the Riparian Rights Acts of 1856 and 1921 were *not* applicable to and granted no rights to the grantees of sovereignty lands from the Trustees of the Internal Improvement Fund . . . ."  86 So. 2d at 789 (emphasis added).

Second, *Claughton* pre-dates the Florida legislature's 1957 repeal of Fla. Stat. § 253.15 (1955) and, therefore, does not address whether Plaintiff's statutory right to bulkhead and fill is subject to the police power.  The answer to that question lies in *Zabel v. Pinellas County Water & Navigation Control Auth.*, 171 So. 2d 376 (Fla. 1965).  Plaintiff cites to *Zabel* for the proposition that statutory rights to bulkhead and fill "may not be taken without compensation."  Pl.'s Br. 34 (citing 171 So. 2d at 381).  But *Zabel* held that the right to bulkhead and fill "is subject to reasonable regulation under the police power."  171 So.2d at 279.  On the facts before it, *Zabel* concluded that "a denial of permission to fill *in this case* amounts to a taking of property without just compensation *because it was not established that the granting of the permit*

*would materially and adversely affect the public interest*."  *Id.* at 381 (emphasis added).  Unlike Plaintiff's ability to use the property in its as-is condition for generating valuable transfer of density units, *supra* Part IV.A.3, the *Zabel* landowner's right to bulkhead and fill were the "only present rights attributable to ownership of the submerged land itself." 171 So.2d at 381.  And unlike the documented adverse effects on public interest Plaintiff's residential development poses, *supra* Part IV.A.2, *Zabel* held that no "material[ly] adverse effect on the public interest had been demonstrated." 171 So. 2d at 379.  It was, in fact, these same bases for distinguishing *Zabel* from this case that prompted the Florida Supreme Court to uphold the substantive basis of another development application denial.  *See Graham v. Estuary Props., Inc.*, 399 So.2d 1374, 1378-79 (Fla. 1981).

For the reasons stated in section IV.A-B of this brief, Plaintiff cannot establish a taking of its real property, including whatever associated rights it has to bulkhead and fill submerged lands.  Plaintiff's attempt to segregate an absolute bulkhead and fill right from the rest of the bundle of rights affiliated with the property and insisting a taking of that right is erroneous as a matter of fact and law.

V.      CONCLUSION

One cannot make a silk purse out of a sow's ear, one cannot spin gold from straw, and

Lemon Bay cannot turn IHT's $15,200 land purchase in 2010 into a nearly $3.9 million takings

claim in 2016.  Plaintiff cannot show that even one of the *Penn Central* factors tips in favor of a

taking.  Nor can Plaintiff show that the Corps' permit denial deprives Plaintiff of all economic

beneficial use of its property.

DATED:  May 26, 2020                    Respectfully submitted,

                                        PRERAK G. SHAH
                                        Deputy Assistant Attorney General

                                        By  */s/ Frank J. Singer*_____
                                        FRANK J. SINGER
                                        CLAUDIA ANTONACCI HADJIGEORGIOU
                                        United States Department of Justice
                                        Environment & Natural Resources Division
                                        Natural Resources Section
                                        Post Office Box 7611
                                        Washington, D.C. 20044-7611
                                        Tel: (202) 616-9409
                                        Fax: (202) 305-0506
                                        Email: frank.singer@usdoj.gov

                                        ATTORNEYS FOR THE UNITED STATES